# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF ARKANSAS

MITCHELL PURDOM                                                    PLAINTIFF

v.                                No. 3:16CV03072

ROGER MORGAN                                                      DEFENDANT

## BRIEF OF THE STATE OF ARKANSAS AS *AMICUS CURIAE* IN OPPOSITION TO PLAINTIFF MITCHELL PURDOM'S MOTION FOR SUMMARY JUDGMENT

The State of Arkansas, through Attorney General Leslie Rutledge, submits this brief at the Court's request that it address both the merits and the justiciability of the claims on which Plaintiff Mitchell Purdom seeks summary judgment. This action does not present an Article III case or controversy, and the claims in this action would fail on the merits even if they were justiciable.

## I. FACTS[1]

On November 3, 2015, Purdom signed an agreement to lease a house owned by Don and Judy Lewis. Purdom agreed to transfer the utilities into his name, and he agreed that he would have no pets in the house. The Lewises required a $500 security deposit, but they agreed to allow Purdom to pay the deposit out over a few months. Purdom took possession of the house the same day. Purdom never paid the security deposit.  Purdom also never transferred the utilities into his name, thus creating debts to the utilities for which the Lewises would be liable. Moreover, in early April 2016, the Lewises discovered that Purdom was keeping a dog in the house.

---

[1] These facts are drawn from filings on the docket, including the statements of the case in the Joint Rule 26(f) Report (Doc. 32) and Plaintiff Purdom's and Defendant Morgan's Stipulation of Undisputed Facts (Doc. 34). The Lewises did not stipulate to the "undisputed facts" contained in the latter filing, and Morgan "ma[de] no claim that he ha[d] personal knowledge of each stipulated fact." Doc. 34 at 2.

As a nonparty, the Arkansas Attorney General's does not stipulate to or otherwise affirm the veracity of these facts, but it assumes them merely for the purpose of this brief.

Purdom asked the Lewises to waive the "no pets" term of the lease, but the Lewises declined. Purdom then made a complaint to the Arkansas Fair Housing Commission, claiming that the Lewises had discriminated against him by refusing to waive the "no pets" term of the lease. On May 27, 2016, the Commission sent a notice of the complaint to the Lewises. On June 2, 2016, the Lewises presented Purdom with an amended lease agreement that included a $500 pet deposit. Purdom refused to sign the amended agreement, so the Lewises gave Purdom a 10-day notice to vacate the property. On June 3, 2016, Purdom reported to the Commission that the Lewises had retaliated against him, and the Commission referred Purdom to Legal Aid of Arkansas.

On June 13, 2016, Purdom filed this action under 42 U.S.C. § 1983 and Ark. Code Ann. 16-123-105 challenging the constitutionality of Arkansas's failure-to-pay-rent/refusal-to-vacate-upon-notice statute, Ark. Code Ann. § 18-16-101. Doc. 1. Purdom brought this action under both the Arkansas and federal constitutions, seeking injunctive and declaratory relief, compensatory and punitive damages, and attorneys' fees and costs. *Id.* The same day Purdom sought a temporary restraining order and preliminary injunction to enjoin Don and Judy Lewis "from taking any efforts to pursue criminal prosecution of or otherwise taking actions to evict [him]." Doc. 3 at 1; *see* Doc. 4.

Purdom's motion also sought to enjoin the Mountain Home City Attorney, Roger Morgan, from filing charges against him during the pendency of this action. Docs. 3, 4. But on June 15, 2016, Purdom withdrew his motion as to Morgan, "based on Mr. Morgan's agreement that the city of Mountain Home will not prosecute Mr. Purdom during the pendency of this action." Doc. 12 at 1. Purdom expressly "d[id] not withdraw his motion . . . against the Lewises." *Id.*

On June 17, 2016, the Court granted in part and denied in part Purdom's motion, issuing an *ex parte* temporary restraining order that enjoined the Lewises from taking actions to evict Purdom for fourteen days. Doc. 13 at 4. The Court ordered that a copy of the order be served on the Lewises by June 22, 2016. *Id.* On June 20, 2016, Don Lewis filed a sworn affidavit with the Baxter County Sheriff's Office, stating that Purdom had not paid rent and other fees. *See* Doc. 41 at 3-4. That same day the Lewises were served with the complaint and temporary restraining order in this action. Docs. 16, 17. The next day the Baxter County Sheriff's Office served Purdom with a refusal-to-vacate-upon-notice citation. Purdom's counsel contacted Baxter County District Attorney David Etheridge and informed him of this action. Doc. 41 at 4. Etheridge nolle prossed the citation against Purdom. *Id.*

Purdom and the Lewises consented to an order granting in part and denying in part Purdom's motion for a preliminary injunction. Doc. 25. Under that agreed order, entered July 13, 2016, the Lewises were preliminarily enjoined from seeking to initiate charges under the statute or to employ self-help to evict Purdom. *Id.* at 2. The Lewises were not enjoined from seeking to evict Purdom through a civil action for unlawful detainer. *Id.* Further, the lease agreement remained in effect. *Id.* On September 29, 2016, Purdom and the Lewises reached a settlement agreement and the Court dismissed Purdom's claims against the Lewises with prejudice. *Id.*

On July 6, 2016, Purdom and Morgan filed a joint motion for a preliminary injunction enjoining Morgan from charging Purdom and for a 30-day stay as to all proceedings relating to the claims against Morgan. Doc. 22. The joint motion again stated that Morgan had agreed not to pursue charges against Purdom during the pendency of this action. *Id.* at 2. On July 8, 2016, the Court entered a preliminary injunction and stay in accordance with Purdom and Morgan's request. Doc. 23.

On August 8, 2016, Purdom vacated the Lewises' residence. Doc. 51 at 5 ¶ 27. That same day, Purdom and Morgan filed a joint motion for a 14-day extension of the Court's stay of the proceedings against Morgan. Doc. 30. Purdom and Morgan stated that they had reached an agreement to submit an unopposed motion for final declaratory and injunctive relief. *Id.* at 2. The motion stated, "Based on this agreement, the parties will submit a Joint Stipulation of Facts in lieu of Defendant Morgan's Answer." *Id.* at 1. The Court granted the joint motion and extended the stay by 14 days. Doc. 31. On August 22, 2016, Purdom filed an unopposed motion for the Court to issue an order permanently enjoining Morgan from enforcing Ark. Code Ann. § 18-16-101. Doc. 33 at 2; *see* Doc. 45 at 1 (the Court describing Purdom's motion as "essentially seeking summary judgment on his claims against Mr. Morgan."). Further, Purdom "move[d] the Court, without opposition from Defendant Morgan, to issue a judgment declaring that Ark. Code Ann. § 18-16-101 violates the United States Constitution and the Arkansas State Constitution." *Id.* Purdom filed a stipulation of facts in support of the unopposed motion. Doc. 34.

On October 14, 2016, the Court held a case management and motion hearing. *See* Doc. 55 (transcript). At that hearing, Roger Morgan entered his appearance on his own behalf and put on the record that several years ago his office had decided not to file any charges for refusal-to-vacate-upon-notice. *Id.* at 8. Morgan stated that he had no intention to pursue charges against Purdom. *Id.* The Court accepted that Morgan had not filed such charges in the long past and that "[h]e d[id] not intend to prosecute Mr. Purdom, even if this suit were to be resolved in—or not in Mr. Purdom's favor." *Id.* at 14.

On October 17, 2016, the Court issued an order expressing concern whether—given the nonadversarial stance of the remaining parties—this case still presents a justiciable controversy and whether it would be prudent for the Court to rule on the motion even if Article III

justiciability still exists. Doc. 39. The Court informed the parties that it was considering soliciting *amicus curiae* briefing or certifying to the Arkansas Supreme Court dispositive issues of state law before reaching any question of federal constitutional law. *Id.* The Court ordered supplemental briefing, *id.*, and on November 10, 2016, Purdom submitted a supplemental brief addressing these issues. Doc. 41. That brief stated, in pertinent part, "At the hearing before this Court, Defendant Morgan asserted that his office does not prosecute [refusal-to-vacate-upon-notice] cases due to concerns about the statute's unconstitutionality." *Id.* at 2.

The Court requested that the Office of the Arkansas Attorney General submit *amicus curiae* briefing concerning the constitutionality of Ark. Code Ann. § 18-16-101. Doc. 42. The Arkansas Attorney General agreed, but directed the Court's attention to Senate Bill 25, which, if enacted by the Arkansas General Assembly, would amend the statute. Doc. 43. The Attorney General noted that Senate Bill 25 would likely moot at least some, and possibly all, of the constitutional challenges levied in this case and would significantly alter the contours of any constitutional challenges not mooted. *Id.* The Attorney General requested that the Court stay this action until either the close of the legislative session or the enactment of Senate Bill 25. *Id.* On January 10, 2017, the Court entered a stay and ordered that the July 8, 2016, preliminary injunction would remain in effect. Doc. 45. The Arkansas General Assembly enacted Senate Bill 25 into law as Arkansas Act 159 of 2017. The Court then ordered Purdom to file an amended complaint to set forth what challenges, if any, he would bring against the statute in light of Act 159. Doc. 50. Purdom filed an amended complaint asserting several claims and requesting declaratory and injunctive relief. Doc. 51. The filing of the amended complaint mooted the then-pending motion for declaratory and injunctive relief. *See* Text Only Order dated 03/13/2017.

On May 8, 2017, Purdom filed a motion for summary judgment. Doc. 53.

## II. NONJUSTICIABILITY ISSUES

Purdom challenges the constitutionality of Arkansas's failure-to-pay-rent/refusal-to-vacate-upon-notice statute. But his amended complaint fails to present a justiciable controversy and his claims all lack merit.

### A. Arkansas does not have a "criminal eviction" statute.

Purdom challenges what he calls a "criminal eviction" statute. But that phrase does not accurately describe any Arkansas law.[2] The statute at issue here—Ark. Code Ann. § 18-16-101—is not an eviction statute. As even Purdom concedes, it does not set forth a procedure whereby a landlord may evict a resident from the landlord's premises.[3] *See* Pl. Brief, Doc. 53-1 at 23 ("The statute itself does not permit a court to evict a tenant.").

At common law, a tenant who fails or refuses to pay rent according to contract maintains a present possessory interest—i.e., a leasehold estate—in the leased residence. But in 1901, Arkansas derogated this common law rule by enacting the State's failure-to-pay-rent/refusal-to-vacate-upon-notice statute. Acts of Arkansas, Act CXXII of 1901. This statute did two things. First, in subsection (a), the statute provided that a tenant who fails or refuses to pay rent when due according to a contract immediately forfeits his possessory interest in the residence by operation of law—without the landlord's taking any action. Second, subsection (b) of the statute deemed unlawful the actions of the resident—who is technically no longer a *tenant*[4]—who

---

[2] Arkansas's eviction statutes set forth a purely civil process. *See* Ark. Code Ann. § 18-17-901 et seq.

[3] Purdom acknowledges that the statute "lacks a mechanism for actually evicting the tenant—a remedy the landlord would have to obtain in civil court." Doc. 53-1 at 14.

[4] Commentators and plaintiffs who criticized or challenged the statute (including Purdom) have consistently failed to recognize that subsection (a) establishes an immediate forfeiture of the tenant's possessory interest (or leasehold estate) upon nonpayment of rent. *See*

willfully refuses to vacate and surrender possession of the residence after 10 days' written notice. The statute makes the resident's action a "misdemeanor" punishable by a fine ranging from $1 to $25 per day. *Id.* The Arkansas Supreme Court subsequently clarified that although the statute uses the word "misdemeanor," the unlawful act is merely a *violation*, which carries the possibility of fines but not imprisonment. *Duhon v. State*, 299 Ark. 503, 511 (1989) (citing Ark. Code Ann. §§ 5-1-107(a)(2) & (c) and 5-1-108(b)); *see* Ark. Code Ann. § 5-4-401 (providing for imprisonment for felonies and misdemeanors only).

The statute survived both state and federal constitutional challenges. In *Munson v. Gilliam* the Eighth Circuit held "that the act did not circumvent the civil statute or put a 'chilling effect' on a tenant's right to assert defenses or force a tenant to risk criminal conviction and fine as a result of what he may have considered to be a justified refusal to pay rent." *Duhon*, 299 Ark. 503, 509, 774 S.W.2d 830, 835 (1989) (summarizing the relevant holding of *Munson*, 543 F.2d 48, 53 (1976)); *see also Munson*, 543 F.2d at 53. The court held "[t]hat a tenant who fails, without justification, to pay rent is in effect stealing property from the landlord and should be criminally punished, is a conclusion available to a state under the Constitution." *Munson*, 543 F.2d at 53. Further, the Arkansas Supreme Court has held that the statute is a valid exercise of police power and does not violate due process. *Duhon*, 299 Ark. 503; *accord Poole v. State*, 244 Ark. 1222 (1968).

---

Ark. Code Ann. § 18-16-101(a) (providing, in pertinent part, that the tenant "shall at once forfeit all right to longer occupy" the residence.); *see In re Gray*, 642 F. App'x 641, 644 (2016) (Colloton, J., concurring) ("[U]nder the better view of Arkansas law, . . . [the tenant] lost any interest in the residence when he failed to pay rent. . . . [His] interest in the residence was effectively terminated . . . ."); *Poole v. State*, 244 Ark. 1222, 1226 (1968) (explaining that the statute "relates only to one who has become a trespasser on property as a result of giving up all legal rights to its possession").

Except for a minor 1937 amendment not relevant here, the statute remained substantively unchanged from its 1901 enactment until 2001, when three changes were made. Act 1733, Arkansas 2001 Session Laws, 83rd General Assembly, Regular Session, 2001. First, the 2001 amendment changed the fine in subsection (b) for refusal-to-vacate-upon-notice to a flat $25 per day. Second, the 2001 amendment added subsection (c)—a provision that a forfeiting tenant who (1) is charged with refusal to vacate upon notice, (2) pleads not guilty, and (3) persists in willfully refusing to vacate the property without justification, must deposit into the registry of the court a sum of money equal to the amount of rent that would have been due under the lease. Subsection (c) further provided that the money paid into the registry of the court would be paid out to the landlord if the tenant were found guilty, or paid back to the tenant if the tenant were found not guilty. Third, subsection (c) provided that a tenant who does not pay the money into the registry of the court and is either found guilty, pleads guilty, or pleads nolo contendere shall be guilty of a Class B misdemeanor.[5]

Most recently, Arkansas Act 159 of 2017 eliminated the 2001 amendment's changes and expressly amended the statute so that it reverted to its exact pre-2001-amendment language. Accordingly, subsection (c) was entirely eliminated and subsection (b) reverted to the original language.

**B. Purdom's amended complaint does not present a live case or controversy for this Court's adjudication.**

Article III of the U.S. Constitution empowers federal courts to rule on the constitutionality of acts of state governments only in the course of deciding questions concerning

---

[5] In Arkansas, a Class B misdemeanor is punishable by up to a $1,000 fine and up to 90 days' incarceration. Ark. Code Ann. §§ 5-4-201(b) and 5-4-401(b).

the rights of individuals that are presented in actual cases or controversies. U.S. Const. art. III, § 2. Purdom's amended complaint does not present this Court with a justiciable controversy.

The allegations in Purdom's amended complaint concerning Roger Morgan—the only remaining defendant—are limited to the following: Morgan, the city attorney for Mountain Home, Arkansas, is elected pursuant to Ark. Code Ann. § 14-43-314; he has authority to prosecute misdemeanor offenses that occur in the City of Mountain Home and he prosecutes tenants under the statute at issue here. Doc. 51 at 3 ¶¶ 10, 28. Yet the amended complaint fails to acknowledge that Morgan has specifically disclaimed any intention to prosecute Purdom (even if this suit is resolved in Morgan's favor) or any other tenant for violating the statute at issue. Doc. 55 at 8, 14; *see* Doc. 41 at 2. And when those factors are considered—whether cashed out in terms of ripeness, standing, mootness, or just a general lack of adversity[6]—Purdom's amended complaint does not present a live case or controversy for this Court's adjudication.

*1. Ripeness.* Purdom's claims are not ripe for adjudication. In *Parrish v. Dayton*, the Eighth Circuit set forth the law of ripeness in detail. 761 F.3d 873, 875 (8th Cir. 2014). The court explained that "the ripeness inquiry requires examination of both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (quotation, citation, and alteration omitted). "The fitness prong safeguards against judicial review of hypothetical or speculative disagreements." *Id.* (quotation and citation omitted). "The hardship prong asks whether delayed review inflicts significant practical harm on the plaintiffs. *Id.*

---

[6] The U.S. Supreme Court has explained that "[t]he various doctrines of 'standing,' 'ripeness,' and 'mootness,' . . . are but several manifestations . . . of the primary conception that federal judicial power is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." *Poe v. Ullman*, 367 U.S. 497, 503-04 (1961) (footnotes omitted). Federal courts "have no right to pronounce an abstract opinion upon the constitutionality of a State law." *Id.* at 504 (quotation omitted).

(quotation and citation omitted). "The touchstone of a ripeness inquiry is whether the harm asserted has matured enough to warrant judicial intervention. A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 875-76 (quotations and citations omitted).

Neither prong of the ripeness test is met here. As the plaintiff, Purdom bears the burden of providing evidence to establish that the issues he raises are ripe for adjudication, and on his motion for summary judgment the facts are construed in the light most favorable to Morgan as the nonmoving party. Viewing Purdom's amended complaint in this light, his allegations arguably do not rise even to a speculative level because Purdom does not actually allege facts sufficient to show that he has suffered harm caused by any legitimate application of the statute or that Morgan is likely to prosecute him for refusal to vacate upon notice. *See* Doc. 51.

First, Purdom's amended complaint does not allege facts sufficient to show that he has suffered harm caused by any legitimate application of the statute. By the terms of subsection (a), the statute applies only to persons who "refuse or fail to pay the rent . . . when due according to contract," thereby "forfeit[ing] all right to longer occupy" the residence. Ark. Code Ann. § 18-16-101(a); see *Poole v. State*, 244 Ark. 1222, 1226 (1968) (explaining that the statute "relates only to one who has become a trespasser on property as a result of giving up all legal rights to its possession"). Here, Purdom has not alleged that he refused or failed to pay his rent when due according to contract. To the contrary, Purdom's amended complaint specifically alleges that "Purdom was current on his rent" at the time of the filing of the original complaint. Doc. 51 at 5 ¶ 26. Because the original complaint was filed on June 13, 2016 (Doc. 1), Purdom had not forfeited his right to occupy the residence by failing to pay the rent as of that date—meaning that the Lewises' previous June 2, 2016, notice to vacate the property (*see, e.g.*, Doc. 51 at 4 ¶¶ 22-

23) could not have been properly served pursuant to the terms of the statute. Purdom has not alleged that the Lewises subsequently served any other notice to vacate.

Second, Purdom has not alleged facts sufficient to show that Morgan is likely to prosecute him. To the contrary, Morgan has not prosecuted Purdom or threatened to prosecute him, and has even said that he will not prosecute him. *See* Doc. 55 at 8, 14; Doc. 41 at 2. Moreover, Purdom has not alleged that Morgan ever caused him to be faced with the prospect of imprisonment or even with a choice of whether to pay into a court registry.

But even if the Court were to read into the amended complaint all of the facts that would be necessary to allege that Purdom faces a real possibility of prosecution by Morgan, Purdom's claim would still rest on purely contingent future events that "may not occur as anticipated, or indeed may not occur at all." *Parrish*, 761 F.3d at 875-76. Purdom has likewise articulated no reason to believe that this Court's delaying review will cause him any harm—to say nothing of the "significant practical harm" required under the second prong of the ripeness test. *Parrish*, 761 F.3d at 875. So because Purdom's claim is not fit for judicial decision and because the Court's withholding review will not cause any hardship to the parties, Purdom's claim is not ripe for adjudication.

*2. Standing.* Purdom lacks standing to challenge either version of the statute. "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000).

First, to show an injury-in-fact, a plaintiff must show "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006).

Purdom lacks standing to challenge any subsection of the 2001 statute for many of the same reasons given in the ripeness analysis above. Purdom has not alleged facts sufficient to show that he has suffered any harm caused by any legitimate application of the statute. By failing even to allege that he comes within the terms of subsection (a), Purdom also lacks standing to challenge subsections (b) or (c). He also lacks standing to challenge subsections (b) or (c) because he has not alleged that Morgan has threatened him with a refusal-to-vacate-upon-notice charge or with having to pay a fine—to say nothing of a threat of imprisonment. In fact, Purdom has not even alleged that Morgan ever received an affidavit from the Lewises that would be needed to initiate a prosecution against him. Nor has Purdom made any claim of a continuing or future violation. In sum, Purdom is not being prosecuted under the 2001 statute, and there is no danger that he will suffer direct injury from its operation or enforcement.

Purdom likewise lacks standing to challenge either subsection of the 2017 statute for many of the same reasons. Even more critically, Purdom lacks standing to challenge the 2017 statute because Purdom's amended complaint alleges that he vacated the Lewis's residence on August 8, 2016—long before the 2017 statute was scheduled to go into effect. Doc. 51 at 5 ¶ 27. Given the facts as alleged, Morgan could not prosecute Purdom under the 2017 statute—a fact that even Purdom concedes. *See* Doc. 53-1 at 13. Consequently, there is no danger that Purdom will suffer direct injury from the 2017 statute's operation or enforcement and he lacks standing. *See Harley v. Zoesch*, 413 F.3d 866, 872 (8th Cir. 2005) (standing is determined at the time that the complaint is filed, and the Court considers the facts as they existed at that time).

Second, Purdom lacks standing because there is no causal relationship between any conceivable injury and the challenged conduct. To demonstrate a causal connection, a plaintiff must show that the injury is "fairly traceable" to the defendant—and not the result of the independent action of some third party not before the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To the extent that Purdom could be said to have suffered any injury, that injury is not "fairly traceable" to the statute or to Morgan but, perhaps, only to the Lewises or some other third party not now before this Court.

And third—with no injury or challenged conduct—Purdom has no claim that is likely to be redressed by a decision against Morgan. Therefore, Purdom lacks standing to challenge either the 2001 or the 2017 statute.

***3. Mootness.*** Purdom's claims under the 2001 statute are moot. "A court properly dismisses a claim as moot if it has lost its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract questions of law." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1024 (8th Cir. 2012) (quotation and citation omitted). Federal courts "lack jurisdiction over cases in which, due to the passage of time or a change in circumstances, the issues presented will no longer be live or the parties will no longer have a legally cognizable interest in the outcome of the litigation." *Id.* (quotation, alteration, and citation omitted).

Any controversy created by the mere existence of the 2001 statute was mooted when the General Assembly amended the statute this year and returned the statute to its exact pre-2001 language. *See Phelps-Roper v. Koster*, 815 F.3d 393, 397 (8th Cir. 2016) (holding that a plaintiff's claim that a Missouri statute was unconstitutional became moot when the state repealed the statute because a case or controversy ceased to exist).

Moreover, to the extent that Purdom argues that the amended portions of the statute remain in force for the purpose of authorizing prosecution of offenses committed prior to the effective date of the amendment, the claim is irrelevant  Indeed, the mere fact that the 2001 statute remains in force for this purpose has no bearing on the question at issue here: whether Purdom can bring a constitutional challenge for a prosecution that does *not* exist.

Also relevant for the mootness analysis is that Purdom has not alleged that the Lewises filed an affidavit to initiate proceedings against him with with Morgan as the Mountain Home City Attorney. Although Don Lewis did file an affidavit with the Baxter County Sheriff's Office (*see* Doc. 41 at 3-4), the Baxter County District Attorney, David Etheridge, nolle prossed the county citation against Purdom the very next day. *Id.* at 4. Thus, any case that Etheridge potentially could have brought against Purdom in the Baxter County District Court came to nothing. For his part, Morgan has not prosecuted or threatened to prosecute Purdom, and he has stated on the record that he has no intention to prosecute him. Doc. 55 at 8, 14; Doc. 41 at 2.

In his brief on mootness and jurisdiction, Purdom also argued that this action is not moot because Morgan voluntarily decided not to pursue charges against him. Doc. 41 at 2. It is certainly true that a defendant's voluntary cessation of challenged conduct moots a case only when that conduct cannot reasonably be expected to recur. *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000). But where the defendant did not perform the challenged conduct in the first place, it is improper even to speak of "cessation." Purdom acknowledges that "his prosecution for failing to vacate rental property" is the challenged conduct (Doc. 41 at 6), but Morgan never prosecuted Purdom to begin with—so it is improper to say that Morgan "ceased" performing the challenged conduct. In fact, Morgan was never presented with the choice of whether to prosecute Purdom, so it is misleading even for Purdom to argue that Morgan made a

"decision" not to do so. Doc. 41 at 2. And again, Morgan has never prosecuted Purdom and has said that he will not. Doc. 55 at 8, 14; Doc. 41 at 2.

Purdom similarly argues that this action is not moot because Morgan's nonexistent prosecution of Purdom is capable of repetition yet evading review. Doc. 41 at 5. As an initial matter, it is difficult to see what injury Morgan's repeating his nonprosecution of Purdom would present for review. As with his voluntary-cessation argument, Purdom's argument here is tantamount to an attempt to survive a mootness challenge by claiming that a boogeyman might return when that boogeyman was imaginary to begin with. But even if the Court were to suppose the counterfactual circumstance in which Morgan had actually initiated a prosecution of Purdom, that conduct would still not evade review. This is not a special case with a short window of time for meaningful action as in, for example, election cases. Any future threat of prosecution would leave Purdom with ample time and opportunity to bring his constitutional challenge. Arkansas law even allows any valid civil defense to be asserted in the criminal proceeding itself. *See Munson*, 543 F.2d at 53-54. Therefore, a constitutional challenge premised on a future prosecution would not evade review.

*4. Adversity.* The instant action lacks the adversity necessary to constitute it as an Article III case or controversy. Adversity is required of any case brought under Article III.[7] *Hohn v. United States*, 524 U.S. 236, 241 (1998).

---

[7] As a result of the lack of adversity created in part by the previous dismissal of the Lewises, several important questions underlying the genesis of this action were never answered, including (1) whether Purdom actually qualified for an accommodation under the Fair Housing Act; (2) whether Purdom made his request to the Lewises for an accommodation in a manner that a reasonable person would have understood to be a request for an accommodation on account of a disability; (3) whether Purdom's request to keep an untrained dog as an emotional-support animal was itself reasonable; and (4) whether, as one-unit landlords, the Lewises were exempt from the provisions of the Fair Housing Act.

The absence of adversity here can be best appreciated in light of the U.S. Supreme Court's opinion in *Poe v. Ullman*, which considered constitutional challenges to an 1879 Connecticut statute prohibiting both the use of contraceptives and any advice regarding their use. 367 U.S. 497 (1961). Like Purdom's amended complaint, the *Poe* plaintiffs' complaints did not clearly allege that the state threatened to prosecute them. *Id.* at 501. Rather, the allegations were "merely that, in the course of his public duty, [the state's attorney] intends to prosecute any offenses against Connecticut law, and that he claims that use of and advice concerning contraceptives would constitute offenses." *Id.* In fact, the Connecticut state's attorney had elected not to prosecute anyone under the statute. *See id.* at 501-02. The Court's opinion noted that the absence of any immediate threat of prosecution against the plaintiffs—by itself—raised suspicions concerning the nonjusticiability of the plaintiffs' claims. *Id.* at 501.

Nevertheless, the Court went on to explain that, "within the framework of our adversary system, the adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity." *Id.* at 503. Importantly for this case, the Court noted that "[t]hese considerations press with special urgency in cases challenging legislative action or state judicial action as repugnant to the Constitution." *Id.*

*Poe* observed that the particular case before it was not to be categorized with those cases that were "'collusive' in the derogatory sense . . . of merely colorable disputes got up to secure an advantageous ruling from the Court." 367 U.S. at 505. Nevertheless, the Court noted that it still "has found unfit for adjudication any cause that is not in any real sense adversary, that does not assume the honest and actual antagonistic assertion of rights to be adjudicated—a safeguard

essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court." *Id.* (quotations and citation omitted).

The instant action is like *Poe* because it has not been, and is not now, adversarial. To begin with, Morgan has never threatened to prosecute Purdom, and he has denied that his office prosecutes anyone under the statute. Doc. 55 at 8, 14; Doc. 41 at 2. Further, Morgan's interest in the statute is so slight that he has chosen not to mount any defense against Purdom's claims in this action. Other than his notice of appearance, Morgan has not made any filing in this case. Instead of answering the complaint, Morgan entered into a joint stipulation of facts filed by Purdom. Doc. 34.[8] Morgan has not responded to any motion, including Purdom's motion for summary judgment. Morgan's inaction is not due to inattentiveness or negligence on Morgan's part. Rather, it is due to Morgan's possessing such a vanishingly-small stake in the statute that he would receive any declaration concerning the statute's constitutionality with a shrug of complacency.[9]

"The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it. . . . No stipulation of parties or counsel . . . can enlarge the power, or affect the duty, of the court in this regard." *People of State of Ca. v. San Pablo & T.R. Co.*, 149 U.S. 308, 314 (1893). Purdom's claims here are not subject to the crucible of controversy that the U.S. Supreme Court has

---

[8] This Court is "not bound to accept as true all that is alleged on the face of the complaint and admitted, technically, by demurrer, any more than the Court is bound by stipulation of the parties." *Poe v. Ullman*, 367 U.S. 497, 501 (1961).

[9] Purdom decided not to add Baxter County District Attorney David Etheridge as a defendant in this action because he also expressed that he would not mount a defense. *See* Doc. 41 at 3 n.3.

declared to be indispensable to the judicial proceedings of Article III courts. Therefore, this action does not constitute an Article III case or controversy.

**C. Even if Purdom's claims were justiciable, prudence and binding precedent counsel abstention.**

Even if this action did present an Article III case or controversy, the Court should still abstain from exercising jurisdiction under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). In that case, the U.S. Supreme Court considered four plaintiffs' challenges to the constitutionality of California's Criminal Syndicalism Act. *Id.* at 38. Three of the four plaintiffs had neither been "indicted, arrested, or even threatened by the prosecutor." *Id.* at 41. Their only claim was that the prosecution of the fourth plaintiff, and the mere existence of the Criminal Syndicalism Act, caused them to "feel inhibited" from exercising their First and Fourteenth Amendment rights to advocate for their political views. *Id.*; *see id.* at 39-40. The Court found that the three plaintiffs' claims could not proceed, explaining that federal courts may not enjoin pending state court proceedings "except under extraordinary circumstances, where the danger of irreparable loss is both great and immediate." *Id.* at 45. *Younger*'s holding applies to both ongoing criminal prosecutions and civil enforcement proceedings, and it applies both to requests for declaratory and injunctive relief. *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013); *Bonner v. Circuit Court of City of St. Louis, Mo.*, 526 F.2d 1331, 1337 (8th Cir. 1975).

Here, Purdom asks this Court to enjoin Morgan from initiating state court proceedings against him and to declare the statute unconstitutional even though Morgan has never initiated prosecution of Purdom and has no intention ever to do so. Purdom has made no claim of irreparable loss, both great and immediate. Therefore, this Court should abstain from exercising jurisdiction over this challenge to the statute under *Younger*.

Moreover, in *Munson*, the Eighth Circuit expressly applied *Younger* to a request for a federal injunction of proceedings under the very statute at issue here and concluded that possible criminal prosecution thereunder is not, in and of itself, irreparable harm. *Id.* at 54. Further, it declared that "state courts are presumed able to protect federal rights and should be afforded the opportunity to do so without unjustified federal interference." *Id.* at 54. Because both prudence and binding precedent counsel abstention, the Court should abstain from exercising jurisdiction under the *Younger* doctrine.

### III. MERITS ISSUES

Even if this action were justiciable, each of Purdom's claims would fail on the merits because the 2001 statute does not violate prohibitions on debtors' prisons, the 2001 statute does not impermissibly chill Purdom's right to a fair trial, the 2001 and 2017 statutes do not violate Purdom's due process rights, and neither version of the statute violates Purdom's right against cruel and unusual punishment.

**A. The 2001 statute does not violate prohibitions on debtors' prisons.**

Purdom argues that the 2001 statute violates state and federal prohibitions on debtors' prisons. He contends that the statute allows indigent persons who plead not guilty to be imprisoned for failing to pay the registry fee without any determination of whether they can afford to pay the fee—and that this unconstitutionally authorizes imprisonment solely due to poverty.

But the statute does not create a debtors' prison because it does not permit "imprisoning a defendant solely because of his lack of financial resources." *Bearden v. Georgia*, 461 U.S. 660, 661 (1983). First, the statute does not criminalize the failure to pay into the court's registry. A person who is charged with an offense under the statute is not charged with a failure to pay but

with a willful refusal to vacate upon notice. *See* Ark. Code Ann. § 18-16-101(b) (2001). Purdom's argument that subsection (c) creates a debtors' prison loses sight of this fact repeatedly, speaking as if the statute criminalizes a debt instead of the willful refusal to vacate upon notice. *See* Doc. 53-1 at 6-7. Distracted as it is from the nature of the actual criminal conduct, Purdom's debtors'-prison claim is, wittingly or not, an extended red herring.

Second, persons who are charged generally have three options to plead: not guilty, guilty, or nolo contendere. Purdom is correct that the 2001 statute requires persons who both (1) plead not guilty and (2) continue to inhabit the premises, to pay the would-be rental payments into the court's registry. Although the statute does not expressly require persons who plead guilty or nolo contendere to pay into the registry, these persons may of course pay voluntarily where such payments would otherwise be required. But the important point is that pleading guilty or nolo contendere does not release those persons from responsibility for making restitution for the sum of money that is due. A person charged under the statute will be held responsible for paying a sum equal to the amount of rent due on the premises regardless of how they plead.

Federal courts routinely impose lesser sentences on criminal defendants who make restitution prior to being adjudicated as guilty. *See, e.g.*, *United States v. Field*, 110 F.3d 592, 594 (8th Cir. 1997) (recognizing that "voluntary payment of restitution prior to an adjudication of guilt is a legitimate consideration in determining whether a defendant is entitled to a reduction for acceptance of responsibility"). Although the 2001 statute is not a strict state analogue to the federal sentencing guidelines, the operative principle is the same: a lesser sentence is appropriate for a criminal defendant who takes responsibility by making restitution. There is, therefore, nothing untoward in the statute's conditioning a lesser potential sentence on a defendant's paying

into the registry of the court a sum equal to the amount of rent due on the premises. The statute does not violate federal prohibitions on debtors' prisons.

Finally, Purdom argues that the statute authorizes imprisonment in the absence of willfulness or fraud, in violation of Article 2, section 6 of the Arkansas constitution. But this is simply incorrect. The statute expressly states that a person who "willfully refuse[s]" to vacate the premises shall be guilty of an offense. Ark. Code Ann. § 18-16-101(b)(1) (2001). Further, in an analysis equally applicable to the 2001 statute, the Arkansas Supreme Court has explained that the statute "relates only to one who has . . . the necessary criminal intent to deprive the rightful owner of his property." *Poole v. State*, 244 Ark. at 1226. Because this criminal intent is required for one to be found guilty of any offense under the statute, it does not violate the Arkansas constitution.

In any case, Purdom's claim that the 2001 statute violates prohibitions on debtors' prisons is a purely academic issue. The Baxter County District Court—the court in which Purdom has alleged that a charge for refusal-to-vacate-upon-notice would be prosecuted (Doc. 51 at 5 ¶ 29)—does not even have a registry into which persons charged under the statute might make such payments. Therefore, even if Purdom had been prosecuted in the Baxter County District Court, he would not have been required to pay into the registry or held responsible for failing to do so.

**B. The 2001 statute does not impermissibly chill Purdom's right to a fair trial.**

Purdom argues that the would-be rental payments into the court's registry and the possibility of imprisonment "impermissibly chill" his right to a fair trial. [10] Specifically, Purdom

_____

[10] Purdom's brief refers to the Sixth Amendment right to a trial by jury. *See* Doc. 53-1 at 7, 8. But the Sixth Amendment right to trial by jury "does not extend to cases involving petty offenses." *U.S. v. Ramsey*, 871 F.2d 1365, 1367 (8th Cir. 1989). A refusal-to-vacate-upon-notice

asserts two things that are intertwined throughout his argument: that subsection (c)'s payment requirement and the possibility of incarceration both (1) unduly deter him from exercising his right to trial by pleading not guilty and demanding a trial; and (2) impair his right to a *fair* trial by failing to uphold the presumption of innocence.

Purdom's argument that subsection (c) impermissibly deters his right to trial relies primarily on *United States v. Jackson*. 390 U.S. 570 (1968). That case involved a challenge to the Federal Kidnaping Act's provision that only a jury can recommend the death penalty on the ground that it discouraged a defendant from pleading not guilty and demanding a jury trial. *Id.* at 582. *Jackson* stands for the proposition that if a statute "had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional." *Jackson*, 390 U.S. at 581. Purdom argues that the statute here violates his constitutional right to trial by requiring a resident who wishes to both remain in the residence and plead not guilty to either make rental payments into the court's registry or face the possibility of a sentence of up to 90 days' imprisonment and potentially greater fines.

But, contrary to Purdom's argument, "*Jackson* did not hold . . . that the Constitution forbids every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights." *Chaffin v. Stynchcombe*, 412 U.S. 17, 30 (1973). Instead, the Supreme Court has upheld convictions even where defendants were deterred by the possibility of a death sentence from asserting the right to plead not guilty and demand a

---

charge is a petty offense. In *Medlock v. State*, the Arkansas Supreme Court held that there is no right to a jury trial for petty offenses and that "[f]or purposes of the Sixth Amendment, it is appropriate to presume that society views an offense carrying a maximum prison term of six months or less as a petty offense." 328 Ark. 229, 232 (1997); *see Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-45 (1989) (holding that there is no right to a jury trial on a DUI offense with potential $1,000 fine, six months' imprisonment, a 90-day license suspension, and the possibility of community service in offender-identifying clothing).

jury trial. *See id.* Indeed, the Court expressly found that there is no constitutional infirmity when an "accused is confronted with the 'certainty or probability' that, if he determines to exercise his right to plead innocent and to demand a jury trial, he will receive a higher sentence than would have followed a waiver of those rights." *Id.* (citing *Brady v. United States*, 397 U.S. 742, 751 (1970)). "[T]he imposition of these difficult choices was upheld as an inevitable attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Id.* at 31; *see Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

The test under *Jackson*, therefore, is not whether the statute at issue *deters* a defendant from exercising his rights, but whether the statute "unnecessarily" and "needlessly" deters him from exercising those rights. *See Chaffin*, 412 U.S. 17, 30 (1973) (citing *Jackson*, 390 U.S. at 582). Here, subsection (c) does not unnecessarily or needlessly deter a defendant from exercising his right to plead not guilty and demand a trial. The resident who is charged with refusal-to-vacate-upon notice has several options: (1) vacate the residence and plead either guilty, not guilty, or nolo contendere—in which case he will be required neither to make rental payments into the court registry nor to face the possibility of imprisonment and a larger fine; (2) remain in the residence, plead guilty, not guilty, or nolo contendere, and make payments into the registry— in which case he will not face the possibility of imprisonment or a larger fine; (3) remain in the residence, plead guilty, not guilty, or nolo contendere, and refuse to make payments into the registry—in which case he will face the possibility of imprisonment and a larger fine. So *only* the defendant who remains in the residence will be required to make payments, and *only* the defendant who both remains in the residence and refuses to make the payments will face the possibility of imprisonment and a larger fine.

Where a defendant remains in the residence, the registry payments are designed to secure an amount equal to the rent due under the rental agreement until the defendant is either acquitted or convicted—at which point the money is either returned to the defendant or paid out to the landlord in lieu of the lost rent. Further, where a defendant who remains in the residence even after being charged with refusal-to-vacate-upon-notice also refuses to make the registry payments and is adjudicated guilty, the possibility of imprisonment and a larger fine is available as a just penalty for what is tantamount to an aggravated theft of property from the landlord. *See Munson*, 543 F.2d at 53 (a person who remains in a residence while failing to pay rent without justification is constitutionally liable to be criminally punished). These provisions do not unnecessarily and needlessly deter a defendant from exercising his right to trial. In fact, their operation is not even necessarily connected to a defendant's decision of whether to exercise his right to trial. Rather, they are tied to the defendant's decision of whether to remain in the residence and, if so, whether to pay into the court's registry. So even if Purdom had standing to challenge subsection (c), and even if his lawsuit presented a live challenge to that provision, it would not impermissibly chill his exercise of his right to trial.

Purdom argues that the registry payments and the possibility of imprisonment and a larger fine violate his right to a *fair* trial by pressuring a defendant to leave his residence before the state has proven its case. Yet far from increasing pressure, the availability of the registry payment actually relieves the pressure to vacate. As set forth more fully below, any legitimate application of the subsection (c) occurs only after a resident has failed to pay rent when due under contract—after he has forfeited any possessory interest in the residence. By allowing the would-be rental payments to be made into the court's registry, subsection (c) relieves the pressure on an innocent resident to vacate the residence by creating a mechanism by which he

can demonstrate a good faith effort not to deprive the landlord of his rights under the contract. Because only a person who remains in the residence and refuses to make the registry payment will face the possibility of imprisonment and a larger fine, a person who makes use of the registry-payment mechanism will actually experience *less* pressure to vacate.

Purdom relies on *Stump v. Bennett*, 398 F.2d 111, 113 (8th Cir. 1968)—a case in which a statute required a defendant to prove his alibi by a preponderance of the evidence—to argue that the statute here is constitutionally problematic because it "fail[s] to require the landlord to hold the tenant's lease until trial is completed, potentially leaving innocent tenants homeless despite an acquittal." Doc. 53-1 at 8-9. To the extent that Purdom intends to argue that the right to a fair trial of a defendant who is unable to afford to vacate the residence is impermissibly chilled, that argument collapses back into his argument that the statute violates the prohibition on debtors' prisons, and the arguments on that point set forth herein are equally applicable.

For these reasons, nothing in the statute impermissibly chills a defendant's exercise of his right to trial or to a fair trial.

## C. The 2001 statute does not violate Purdom's due process rights.

As an initial matter, Purdom's right to due process has not been violated because this action—as pled—does not present any legitimate application of the statute. As noted above, Purdom has not alleged that he ever refused or failed to pay his rent. *See* Doc. 51 at 5 ¶ 26. Therefore, even accepting all of Purdom's other allegations, the statute never came into operation, and Purdom did not forfeit his right to occupy the residence under subsection (a)— meaning that the Lewises' notice to vacate could not have been a legitimate application of subsection (b) of the statute. Because the "[c]onstitutionality of an act must be tested not by what has been done under it, but by the power to act which it actually grants," the statute cannot be

struck down based on the Lewises' conduct, which was not a legitimate application of the statute. *Duhon*, 299 Ark. at 510.

Second, Purdom's due process rights have not been violated because there is no state action. To set forth a due process violation a plaintiff must first establish that state action impacts a protected property interest and then that the state deprived him of that interest without providing constitutionally-due process of law. *Hall v. Ramsey Cty.*, 801 F.3d 912, 919 (8th Cir. 2015); *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013). Here, there is no state action because Purdom has not alleged that Morgan took any action against him. Moreover, because there was no legitimate application of the statute, it follows that Purdom cannot even maintain that there was state action in the form of a statutory authorization of the Lewises' conduct. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 354 (1974) (rejecting the argument that a private party's action was state action because the state had "specifically authorized and approved" the action); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 927 (1982) (state action is an implicit predicate of the application of due process standards).

Further, even if Purdom had been charged with violating the statutory provisions, had pled not-guilty, and had made registry rental payments, Purdom's due process claim would still fail on the merits. Under *Matthews v. Eldredge*, courts consider the private interest at stake, the risk that official action will erroneously deprive an individual of their private interest, and the government's interest in determining whether an individual has been deprived of due process. *Id.* at 335. Applying that standard, Purdom cannot demonstrate a due process violation. First, two private interests are at stake here with the resident having an interest in not being wrongfully deprived of money paid into the court's registry and the landlord having an interest in not being wrongfully deprived of contractually due rental payments. The statute requires that the resident

make the would-be rental payments into the court's registry only so long as he remains in the residence—and he has the option to vacate the residence at any time. Thus, the statute requires the resident to make payments into the court's registry only for an amount equal to that which he already owed to the landlord. Because the resident's obligation to pay into the court's registry picks up only where his obligation to pay rent to the landlord leaves off, he is not held responsible for making any payments above that which he would have been otherwise bound to pay.

Second, there is minimal risk that Purdom will be erroneously deprived of the money he pays into the court's registry. Purdom seems to argue that a predeprivation hearing is necessary to avoid the risk of an erroneous deprivation. He relies on three U.S. Supreme Court cases, claiming that they collectively hold that "a hearing is required before a debtor can be forced to cede a property interest to a creditor." Doc. 53-1 at 11. In the first two cases, *Sniadach v. Family Fin. Corp. of Bay View* and *Connecticut v. Doehr*, the Court held that where neither notice nor a predeprivation hearing is given, prejudgment attachment of the debtor's wages or real estate, respectively, violate due process. 395 U.S. 337, 342 (1969); 501 U.S. 1, 24 (1991). The third case on which Purdom relies, *Fuentes v. Shevin*, 407 U.S. 67 (1972), is no longer good law, as five members of the Court expressly stated that the subsequently-decided opinion in *Mitchell v. W. T. Grant Co.*, was inconsistent with it. *See* 416 U.S. at 623 (Powell, J., concurring) ("I think it fair to say that the *Fuentes* opinion is overruled."); *id.* at 635 (Stewart, J., dissenting) (recognizing that *Mitchell* "unmistakably overruled" *Fuentes*); *id.* at 636 (Brennan, J., stating that following *Fuentes* would have required reversal in *Mitchell*).

Purdom's cited cases involve the prejudgment seizure—through attachment or replevin—of a debtor's property. But there is no seizure of property in this action because the statute

plainly leaves to the resident the choice of whether to pay into the court's registry. Purdom asserts that the threat of incarceration is effectively a seizure of the would-be rental payments. Doc. 53-1 at 10. But he offers no authority for this proposition. In any case, Purdom's argument is self-defeating because he has apparently not paid the registry fee despite this allegedly-coercive threat of incarceration.

Purdom's claim that a hearing is required before a debtor can be forced to cede a property interest to a creditor is inaccurate. But even if that were the collective holding of the three cases he cites, it would not apply here because no property interest in the registry payments is ceded to a creditor—and certainly not before a hearing. Under the statute, the resident deposits an amount of money equal to the sum of rent already due into the court's registry—not with the landlord. The money is paid out to the landlord after the hearing only if the resident is found to have wrongfully refused to vacate upon notice.

Although *Mitchell* also involved a prejudgment seizure—and is, therefore, not really analogous to the instant action—that case is a better fit here than the cases Purdom cites. Under the Louisiana statute in *Mitchell*, a creditor who has an vendor's lien in certain property purchased and held by the debtor, and who submits an ex parte application, an affidavit, and bond, can obtain a writ sequestering the property from the debtor. *Mitchell*, 416 U.S. at 605. The debtor can seek dissolution of the writ or regain immediate possession by filing his own bond with the court. *Id.* at 605-07. Similar to Purdom, the petitioner in *Mitchell* argued that due process "necessarily forbade the seizure without prior notice and opportunity for a hearing." *Id.* at 603. But the Court recognized that because both the buyer and the seller have an interest in the property, the due process analysis must take account of both. *Id.* at 604. The Court found that "the seller here, with a vendor's lien to secure payment of the unpaid balance of the purchase

price, had the right either to be paid in accordance with its contract or to have possession of the goods for the purpose of foreclosing its lien and recovering the unpaid balance." *Id.* at 607. The Court found that the State of Louisiana was entitled to protect the seller's property interest by taking control of the property. *Id.* at 607-08. It found that the statutory procedure's accommodating the conflicting interests of the parties did not violate due process. *Id.*

Similar to the buyer in *Mitchell*, a landlord has a right either to possession of his property or else to be paid in accordance with resident rental contract. The statute accommodates the conflicting interests of the landlord and resident without violating due process—especially given that it does not allow for the seizure of either the rental property or the rental payments. Various procedural protections also ensure that the resident receives due process. First, the mere existence of the requirement that the resident pay the would-be rental payments into the court's registry and *not* to the landlord ensures that—if the resident were actually paying his rent to the landlord when due—the landlord would not be motivated to make an improper charge under the statute, for that action would tend to cause the resident to redirect his rental payments away from the landlord and into the court's registry. This procedural protection helps to ensure that *only* individuals who have committed the predicate acts of a refusal-to-vacate-upon-notice charge (e.g., the failure to pay rent) will likely be required to pay into the court's registry. Second, before charges would have been filed, the landlord would have had to submit a sworn affidavit setting forth the existence of a rental agreement, the nonpayment of rent, and the refusal to vacate upon notice—thereby rendering *himself* liable to a potential malicious-prosecution lawsuit if those allegations turn out to be false.[11] *See Parker v. Brush*, 276 Ark. 437 (1982) (malicious-

---

[11] Note also that "[u]nder Arkansas law, a landlord lying to the prosecutor can be prosecuted for false swearing, malicious prosecution, or obstructing government operations." *Munson v. Gilliam*, 543 F.2d 48, 54 n.20 (1978).

prosecution lawsuit against an individual who wrongfully obtained a warrant for the arrest of a tenant for refusal to vacate upon notice). Third, the resident would be the recipient of both notice and a hearing at which he could respond and raise any affirmative defenses. Fourth, subsection (c)(2)(A) provides that, if the resident prevails, the money he has paid will be returned to him. These statutory procedures reduce the risk of an erroneous payment sufficiently as to eliminate any reasonable due process concern.

Further, the impact of any erroneous payment into the court's registry would not be great enough to require a predeprivation hearing. In *Goldberg v. Kelley*, the U.S. Supreme Court held that a recipient of welfare benefits must be afforded an evidentiary hearing before the government can terminate those benefits. *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). The Court's rationale was that terminating a person's welfare benefits before a hearing might deprive an eligible recipient of the very means by which to live while he waits. *Id.* Subsequently, in *Matthews v. Eldredge*, the Court considered whether *Goldberg*'s holding extended to the government's decision to terminate disability benefits. 424 U.S. 319. The Court noted that the delay between the disabled person's request for a termination hearing and a decision on the termination's propriety was between 10 and 11 months. *Id.* at 341-42. Nevertheless, the Court distinguished *Goldberg*, observing that—whereas welfare benefits are based on financial need—disability benefits are "wholly unrelated to the worker's income or support from many other sources, such as earnings of other family members, workmen's compensation awards, tort claims awards, savings, private insurance, public or private pensions, veterans' benefits, food stamps, public assistance," or many other programs both public and private. *Id.* at 340-41 (footnote omitted). The Court explained that even though a recipient of disability benefits will be unable to engage in substantial gainful activity, the disabled person's need is still likely to be less than that

of a welfare recipient. *Id.* at 342. The Court noted that because additional financial relief that was not available to welfare recipients was potentially available to disabled persons, there was not sufficient reason to depart from the "ordinary principle" that no predeprivation hearing is necessary. *Id.* at 343.

Although the issue here is not the deprivation of government benefits, the fundamental due process principle is the same. Any erroneous payment into the court's registry would be remedied by a decision at a hearing that is almost certain to occur sooner than the 10- to 11-month time period of *Matthews*. 424 U.S. at 341-42. Moreover, any erroneous payment would occur concurrently with the resident's remaining in the residence—meaning that the resident would not be deprived of a place to live. Finally, any erroneous payment would be merely a temporary deprivation, as a resident who is found not guilty will be awarded full retroactive relief.

Finally, the State has a significant interest in the efficient administration of justice, which includes prosecuting criminal conduct and facilitating restitution where that conduct has harmed its citizens. The Eighth Circuit has noted that the "statute has been declared by the Arkansas Supreme Court to be in the public interest." *Munson*, 543 F.3d at 53 (citing *Poole v. State*, 244 Ark. 1222). The court explained that the State is within its rights to hold "[t]hat a tenant who fails, without justification, to pay rent is in effect stealing property from the landlord and should be criminally punished." *Munson*, 543 F.2d at 53. Therefore, facilitating restitutionary payments to a landlord in such cases is in the State's interest. Further, the cause of justice is efficiently served by the statutory procedure—which leaves the power of paying into the court's registry with the resident. Moreover, to hold that a court hearing must be held before registry payments are made would require the courts to conduct proceedings on issues that are easily provable by

the submission of a signed rental agreement and an affidavit setting forth the resident's nonpayment of rent and refusal to vacate upon notice. Indeed, adding a hearing requirement would create fiscal and administrative burdens without any discernible benefit.

Each of the three factors cut against finding a due process violation. For each of the reasons set forth, the 2001 statute does not violate Purdom's due process rights.

**D. The 2017 statute does not violate Purdom's due process rights.**

Purdom argues that the amended 2017 statute violates due process because it "impermissibly chills" a defendant's exercise of the right to trial and is impermissibly vague. But the language of the 2017 statute is identical to the version of the statute that withstood several constitutional challenges. In *Duhon*, for example, the Arkansas Supreme Court approvingly cited the Eighth Circuit's opinion in *Munson v. Gilliam*, which held "that the act did not circumvent the civil statute or put a 'chilling effect' on a tenant's right to assert defenses or force a tenant to risk criminal conviction and fine as a result of what he may have considered to be a justified refusal to pay rent." *Duhon*, 299 Ark. 503, 509, 774 S.W.2d 830, 835 (1989) (summarizing the relevant holding of *Munson*, 543 F.2d 48, 53 (1976)). The plaintiff in *Munson* had made the same argument that Purdom makes here, namely, that the statute "puts a 'chilling effect' on the tenant's right to assert defenses and forces the tenant to risk criminal conviction and fine as a result of what he may have considered to be a justified refusal to pay rent." *Munson*, 543 at 50.

Purdom asserts that the 2017 statute "chills the right to trial by increasing without limit the number of convictions and total fines faced by those who maintain their innocence, precisely because they elect to plead not guilty and for as long as they insist on a trial." Doc. 53-1 at 14. This is incorrect. Purdom argues as if the statute criminalizes the defendant's exercise of a right to trial. But the statute could not be clearer that the refusal to vacate upon notice is the criminal

act for which one is charged: "Each day the tenant shall *willfully and unnecessarily hold the dwelling house . . .* after the expiration of notice to vacate shall constitute a separate offense." Ark. Code Ann. § 18-16-101(b)(2)(B). Therefore, a defendant who vacates the residence can "insist on a trial" as much as he would like without facing mounting charges. A few pages later, Purdom makes a very similar argument that the statute is void for vagueness due to its purported "fail[ure] to place any constraints on the number of convictions or total fines a defendant faces under the statute." Doc. 53-1 at 17. But again, the statute could not be clearer that the number of potential convictions and fines is constrained by the number of days that the defendant refuses to vacate upon notice. *See* Ark. Code Ann. § 18-16-101(b)(2)(B).

Purdom shows that he is grasping at straws with his claim that one of the most effective tools that "an unscrupulous landlord" has to force a tenant off of his property is "to delay filing a complaint in order to maximize the number of convictions the tenant faces once the prosecution commences." Doc. 53-1 at 18. But because a landlord's interest is in regaining possession of his residence—not in simply sticking it to the resident—this Court need not give serious consideration to the speculative possibility that a state court might permit a landlord to abuse the statute in this vindictive manner. And in any case, Purdom has not alleged that the Lewises attempted to abuse the statutory process in this way.

Each day that the resident wrongfully refuses to vacate is a day that the landlord is deprived of his right to possess the residence. The 2017 statute is hardly unique in providing that each day that the criminal conduct continues constitutes a separate offense punishable by a fine. To mention just a few: Ark. Code Ann. § 8-8-201 (violation of radioactive waste compact); *id.* § 11-10-316 (refusal to attend a hearing of the Department of Workforce Services); *id.* § 17-38-102(a) (plumbing without a license); *id.* § 17-95-402 (practicing medicine without a license); *id.*

§ 26-55-213 (engaging in business as a distributor without a license). The major premise of Purdom's argument would imply that all such provisions violate due process. But a statute providing that each day constitutes a separate offense punishable by a separate fine does not violate due process so long as there is notice and a meaningful opportunity to be heard. *See, e.g.*, *Yaodi Hu v. Vill. of Midlothian*, 631 F. Supp. 2d 990, 1010 (N.D. Ill. 2009) (fines on a commercial property owner where each day constituted a separate offense did not violate due process rights). As set forth above, those conditions are met in this instance because the resident is provided with both notice and a hearing.

Purdom misleadingly implies that an individual can be charged with a Class B or Class C misdemeanor under the 2017 statute. Doc. 53-1 at 15. This is also incorrect because an individual cannot even be charged with an unclassified misdemeanor under the statute. Although the statutory language describes an infringement as a "misdemeanor," the Arkansas Code specifies that such an infringement is to be classified as mere "violation" because it does not authorize any sentence other than a fine upon conviction. *See Duhon v. State*, 299 Ark. 503, 511 (1989) (citing Ark. Code Ann. § 5-1-108(b)). The $1 to $25 fine under subsection (b)(2)(A) for each offense is not excessive and it does not violate Purdom's due process rights.

**E. Neither version of the statute violates Purdom's right against cruel and unusual punishment.**

Purdom's final argument is that both versions of the statute violate his Eighth Amendment right against cruel and unusual punishment.[12] He argues that, "at the core of both versions . . . is their criminalization of what is otherwise universally recognized as a civil property dispute." Doc. 53-1 at 20. But, as the Arkansas Supreme Court has noted, there is

---

[12] Purdom concedes that Morgan cannot prosecute Purdom under the 2017 statute. Doc. 53-1 at 13.

nothing improper about the State creating both civil and criminal liabilities for refusal-to-vacate-upon-notice, and the statute at issue here does not circumvent the civil eviction process. *Duhon*, 299 Ark. at 509 (citing *Munson*, 543 F.2d 48).

Purdom concedes that "the statutes' penalties are not per se cruel and unusual," but he contends that "criminalizing the failure to pay rent is inherently disproportionate." Doc. 53-1 at 22. But contrary to Purdom's claim, the statute does not "criminaliz[e] the failure to pay rent." Rather, it makes it a criminal offense for a person who has forfeited his possessory interest in his residence to refuse to vacate the residence upon 10 days' notice.

Purdom also argues that "evolving standards of decency" limit the police power of the state by barring punishments that are grossly disproportionate to the crime. Doc. 53-1 at 20. This is correct but inapplicable. As the Arkansas Supreme Court noted in a discussion of the statute at issue here, "[n]o one can seriously argue that wrongful trespass does not come within the police power of the state, and the use of the police power to prevent such wrongful acts which disrupt the well-being, peace, happiness, and prosperity of people surely bears a real and substantial relationship to an end which promotes the public health, safety, and welfare." *Poole*, 244 Ark. 630-31.

Purdom further claims that the "clearest indicator" that the statutory penalty is disproportionate is that Arkansas stands alone in making refusal-to-vacate-upon-notice a criminal offense. *Id.* at 21. But the U.S. Supreme Court has noted that this sort of interjurisdictional analysis does not provide the sort of clarity that would be necessary to establish Purdom's claim. *See Rummel v. Estelle*, 445 U.S. 263, 281-82 (1980). In *Rummel*, the defendant received a mandatory life sentence under a Texas recidivist statute when he committed three felonies—which, when combined, amounted to the fraudulent acquisition of less than $300. *Id.* at 265-66.

On appeal, the defendant tried to ground a proportionality attack on an alleged "nationwide" trend away from mandatory life sentences and argued that "[n]o jurisdiction in the United States or the Free World punishes habitual offenders as harshly as Texas." *Id.* at 277. Yet the Court upheld the conviction against an Eighth Amendment challenge, noting that, "[a]bsent a constitutionally imposed uniformity inimical to traditional notions of federalism, some State will always bear the distinction of treating particular offenders more severely than any other State." *Id.* at 282. The Court noted intriguing variations among what acts different states punish as criminal offenses, *id.* at 282, and it concluded that "[e]ven were we to assume that the statute employed against [the defendant] was the most stringent found in the 50 States, that severity hardly would render [his] punishment 'grossly disproportionate' to his offenses or to the punishment he would have received in the other States." *Id.* at 281.

Here, as in *Rummel*, even if Arkansas had the most stringent penalty for refusal-to-vacate-upon-notice (or were the only state with such a criminal penalty), it would not follow that the penalty was grossly disproportionate and an Eighth Amendment violation. At its core, Purdom's "evolving standards" argument is little more than a bald assertion that while other states once had such criminal penalties, many have "evolved" to a point where these penalties came to be regarded as indecent and were abolished. *See* Doc. 53-1 at 20 (asserting that Arkansas "undeniably lags well behind the evolving standards of decency of both the nation and the state" and that the "statute is morally outdated"). But there is no evidence to support this evolutionary narrative. Additionally, the penalties under the statute here are proportional to (or even more favorable than) many other nonviolent offenses under the Arkansas Code. *See, e.g.*, Ark. Code Ann. § 5-36-202 (classifying as a Class A misdemeanor the theft of a public benefit of $500 or less); *id.* § 5-36-115 (classifying as a Class A misdemeanor the theft of leased property of $1,000

or less; *id.* § 5-36-104 (classifying as a Class A misdemeanor the theft of utility services involving any damage to property).

Further, courts have recognized in other contexts that the State's creation of criminal penalties for refusal-to-vacate-upon-notice is not an unconstitutional imposition. The Eighth Circuit has held "[t]hat a tenant who fails, without justification, to pay rent is in effect stealing property from the landlord and should be criminally punished, is a conclusion available to a state under the Constitution." *Munson*, 543 F.2d at 53. The Arkansas Supreme Court has also specifically addressed the uniqueness argument. In *Duhon*, the court recognized that statutes are presumed to be constitutionally valid, and it held that "[t]he mere fact that § 18-16-101 is unique . . . does not overcome its presumption of validity." 299 Ark. at 510. And Purdom does not point to any authority showing those holdings have been overruled or undermined.

The statute does not violate Purdom's rights under the Eighth Amendment.

## CONCLUSION

For the foregoing reasons, this action is nonjusticiable, and even if it were justiciable, Purdom's claims would individually fail on the merits. Therefore, the State of Arkansas respectfully requests that the Court deny Purdom's motion for summary judgment and dismiss this action.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

By:     */s/ Michael A. Cantrell*
Michael A. Cantrell
Ark. Bar No. 2012287
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Ph: (501) 682-2401
Fax: (501) 682-2591
Email: Michael.Cantrell@ArkansasAG.gov

*Attorneys for the State of Arkansas*

## CERTIFICATE OF SERVICE

I, Michael A. Cantrell, hereby certify that on June 29, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notice to all counsel of record.

*/s/ Michael A. Cantrell*
Michael A. Cantrell