**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION**

**MITCHELL PURDOM**                                                     **PLAINTIFF**

**VS.**            **NO. 16-cv-3072 TLB**

**ROGER MORGAN in his official capacity as**                           **DEFENDANT**
**City Attorney for Mountain Home**

**PLAINTIFF'S RESPONSE TO STATE OF ARKANSAS' BRIEF AS *AMICUS CURIAE*
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The State of Arkansas, both to contest this case's justiciability and the merits, ignores the fundamental point that Plaintiff Mitchell Purdom would have been prosecuted for failing to vacate but for the fact that he filed this lawsuit to protect his constitutional rights. As discussed below, whether Plaintiff proceeds against only Defendant Morgan or amends the complaint to add the Baxter County District Attorney, Mr. Purdom is entitled to a judgment on the merits preventing him from ever being prosecuted for failing to vacate under either the 2001 or the 2017 criminal eviction statutes.

Remarkably, though the State successfully delayed this case for nearly half a year on the premise that the 2017 criminal eviction statute would moot all or part of Mr. Purdom's lawsuit, it now admits that Mr. Purdom may only face prosecution under the old law. The State's defense of the 2001 statute depends almost entirely on the fiction that, despite the statute's explicit authorization of additional jail time for those who do not pay the registry, the law only punishes failure to vacate. This is demonstrably false, and the statute's exaction of what amounts to a trial fee under threat of incarceration requires the conclusion that the 2001 statute is unconstitutional.

However, the 2001 statute in its entirety violates the Eighth and Fourteenth Amendments. Therefore, even if the Court does not reach the constitutionality of the new statute, the laws contain the same inherent constitutional defects: they criminalize a civil debt without any measure of due process, all to advantage landlords in their effort to evict tenants. A judgment against the 2001 statute thus would necessarily invalidate the 2017 version.

## I.     This Case is Justiciable

### A.  This Case Is Justiciable notwithstanding Defendant Morgan's Voluntary Decision Not to Prosecute during the Pendency of these Proceedings.

The Attorney General emphasizes throughout its brief that this action is not justiciable because the Defendant, Mountain Home City Attorney Roger Morgan, never threatened Mr. Purdom with prosecution, and has stated he has no intention to prosecute Mr. Purdom. *E.g.* State's Br. at 9, 11 (ripeness), 12 (standing), 14 (mootness), 17 (adversity), ECF No. 56. However, the AG neglects the fact that Defendant Morgan's intentions are typically irrelevant to whether an individual accused of failure to vacate is actually prosecuted. This point potentially explains how, despite Morgan's representation that his office halted prosecutions under the statute several years ago, 25 such prosecutions nonetheless occurred in the Mountain Home Division of the Baxter County District Court between May of 2015 and June of 2016. Pl.'s Stat. of Undisputed Material Facts 3, ¶16, ECF No. 53. Morgan's office generally does not make appearances in this court, whose criminal docket consists primarily of matters like minor traffic offenses. Yet failure-to-vacate prosecutions regularly proceed under the state's name, just as they do with traffic tickets. Consequently, Plaintiff's counsel's efforts to halt Mr. Purdom's prosecution by Defendant Morgan and Baxter County District Attorney David Etheridge are the only reason Mr. Purdom's case did not proceed to the Mountain Home Division.

As to Defendant Morgan's declaration that he would not prosecute Mr. Purdom in the future, there is an unresolved issue of fact with respect to whether Defendant Morgan still maintains that position. The AG does not dispute that Defendant Morgan refused to prosecute under the criminal eviction statute—at least knowingly—based on concerns about the law's legality. And there is no disputing that Defendant Morgan expressed these concerns before the AG accepted this Court's invitation to defend the constitutionality of the 2001 and 2017 criminal eviction statutes. Further, Arkansas law charges the AG with defending the state's interests in federal courts. Ark. Code Ann. § 25-16-703(a). The AG having now assumed this mantle, it is unclear whether Defendant Morgan would, or could, maintain the position that legal concerns about the criminal eviction statute should prevent Mr. Purdom's future prosecution should this Court rule in Morgan's favor.

It must be noted that Defendant Morgan's refusal to defend the criminal eviction statute in federal court is not unlike the AG's initial refusal to defend the statute's constitutionality in this or any of the other recent cases challenging the law around the state. The AG's refusal persisted despite receiving notice of each challenge, and despite several circuit courts declaring the statute unconstitutional, rendering the statute a nullity across most of the state. Pl.'s Stat. of Undisputed Material Facts 4. Prior to the AG's participation in this case, a local prosecutor like Defendant Morgan with doubts about the statute could have assumed reasonably that the AG's silence in the face of this and prior (successful) challenges to the law indicated that AG shared his misgivings about the statute's constitutionality. That assumption can no longer hold. The Court therefore should not assume that Defendant Morgan would continue refusing to enforce the statute after the State Attorney General's Office expressly, though belatedly, declared its position that the law is both reasonable and constitutional.

The AG correctly notes that the Lewises eventually filed an affidavit under the statute with District Attorney Etheridge, not Defendant Morgan. As Plaintiff's counsel previously explained, they did not name Etheridge as a defendant because, like Defendant Morgan, Etheridge also indicated that he would not defend statute's constitutionality in federal court. Pl.'s Suppl. Br. 3, n.3, ECF No. 41. Regardless, Etheridge retains the authority to re-institute a prosecution against Mr. Purdom should the Court decide this case in the State's favor. Given these facts, and the AG's participation as amicus in support of the statute's constitutionality, naming Etheridge as a defendant would eliminate the current justiciability concerns the AG raises with regard to Defendant Morgan. Plaintiff therefore requests that, should the Court conclude that a lawsuit against Defendant Morgan is not justiciable, the Court grant leave for the Plaintiff to name Etheridge as a defendant and decide the merits. *See* Fed. R. Civ. P. Rule 19(a)(1)(A) (requiring joinder of party where "in that person's absence, the court cannot accord complete relief among existing parties").

**B. This Case is Ripe for Adjudication**

The main purpose of the ripeness doctrine is "to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). Consequently, a case is ripe if it meets two basic requirements: 1) the claims presented are fit for judicial review; and 2) withholding adjudication will impose a hardship on the plaintiffs. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977). Plaintiff's claims easily satisfy both factors. First, the claims are fit for review because Mr. Purdom's facial challenge to the criminal eviction statute is purely legal. *Abbott Labs*, 387 U.S. at 149 (holding that purely legal questions are appropriate for judicial review). Second, at the time Mr. Purdom filed this

lawsuit, Mr. Purdom faced imminent prosecution under the statute. He averted this prosecution through the Court's temporary and preliminary injunctions and Plaintiff's counsel's independent efforts with Defendant Morgan and District Attorney Etheridge. *See Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 507 (1972) (finding challenge to Michigan statute ripe where Defendants' enforcement of statute was certain).

The AG asserts that this case is not ripe for review because Mr. Purdom "has not alleged that he refused or failed to pay his rent when due according to contract," and he therefore cannot demonstrate a harm based on a legitimate application of the statute. State's Br. 10. But the AG's position flies in the face of its recitation that, according the Lewises, Mr. Purdom owed over $1000—$500 from an initial security deposit, an unspecified amount in utility bills, and a subsequent $500 pet deposit—at the time they served him with the 10-day notice to vacate under the statute. State's Br. 1-2. Regardless of their truth, these hearsay allegations would have established a basis for prosecution, and Mr. Purdom's counter-allegations that he was current on his rent and should not have been required to pay an additional deposit for an emotional support animal would have been defenses to the prosecution. The AG cites no authority for the proposition that a factual defense to the merits of a criminal prosecution renders unripe an affirmative action challenging the prosecution itself as facially unconstitutional. Indeed, the facial nature of the Mr. Purdom's challenge to the criminal eviction statute renders his defense, or any other particulars of the criminal case, irrelevant to this case. Precisely because such facts are irrelevant and require no further development, the purely legal issues in this case are fit for review. *Abbott Labs*, 387 U.S. at 149.

Repacking its argument that Defendant Morgan is unlikely to prosecute Mr. Purdom, the AG next contends that Mr. Purdom cannot demonstrate the hardship necessary to establish

ripeness.  For the reasons stated above, the Court should reject this argument.  In addition, this Court has expressly maintained through the pendency of this action the preliminary injunction prohibiting Defendant Morgan from enforcing the criminal eviction statute against Mr. Purdom. Order and Op. 3-4, ECF No. 50.  The fact of that preliminary injunction, which by its very nature is designed to prevent imminent and irreparable harm, cannot serve as the basis for the AG now to contend that Mr. Purdom does not face imminent harm.

### C.  Mr. Purdom Has Standing to Challenge the 2001 Statute

Mr. Purdom filed this case to halt his imminent failure-to-vacate prosecution in the Mountain Home Division of the Baxter County District Court and to mount a facial challenge to Arkansas' failure to vacate statute.  The Court's preliminary orders and Plaintiff's counsel's advocacy have since halted Mr. Purdom's prosecution and cleared the way for this Court to reach the merits of this lawsuit.  On these facts, Mr. Purdom has standing to challenge the statute.

The AG separately challenges Mr. Purdom's standing under the 2001 and 2017 versions of the statute.  For the 2001 statute, as well as to contest causality and redressability under both statutes, the AG repeats its arguments against ripeness.  *See* State's Br. 12-13.  Mr. Purdom will not repeat his responses.

For the 2017 statute, the AG asserts that Mr. Purdom lacks standing because the conduct at issue occurred before that statute's enactment.  AG Br. at 12.  The AG characterizes Mr. Purdom as having "conceded" that he cannot be prosecuted under the new statute.  Though technically true, this is fundamentally misleading.  Mr. Purdom has previously noted the fact, well-established under Arkansas law, that he cannot be prosecuted under the 2017 statute because it contains no express clause applying its terms retroactively to pre-enactment conduct. However, Mr. Purdom made this argument in opposition to the AG's request to delay this case

significantly pending the legislature's consideration of the new statute, a request explicitly premised on the notion that the new statute would moot all or part of this action.  State's Br. 5. The AG subsequently reasserted that the 2017 statute may moot all or part of this lawsuit to request successfully that the Court require Mr. Purdom to amend his Complaint to incorporate claims against the new statute.  Over six months and an (apparently unnecessary) Amended Complaint later, the AG offers no explanation for this stunning, though correct, reversal.[1]

### D.  Plaintiff's Challenge is Not Moot

As Plaintiff previously argued in this supplemental memo on jurisdiction, Defendant Morgan's voluntary agreement not to prosecute Mr. Purdom during this lawsuit does not moot his challenge to the 2001 criminal eviction statute.  This is especially true now that the AG has expressed its official view on behalf of the State of Arkansas that Mr. Purdom can be constitutionally prosecuted under the statute.

The AG first presses that Mr. Purdom's claims against the 2001 statute are mooted by the 2017 amendments.  The Court should reject this baseless argument for the reasons Mr. Purdom—and the Attorney General—has already advanced.  Pl.'s Summ. J. Br. 13, ECF No. 53-1; State's Br. 12.  The 2017 statute is not retroactive and therefore has no effect on the 2001 statute.  The remainder of the AG's mootness points rest on Defendant Morgan's enforcement of the 2001 statute, which Plaintiff has already addressed.

---

[1] Plaintiff notes that, under Rule 11 of the Federal Rules of Civil Procedure, in submitting its requests to stay briefing and for Plaintiff to amend his Complaint, the AG necessarily represented to the Court that it was not doing so to "cause unnecessary delay" and that its implicit legal contention that Mr. Purdom could be prosecuted under the new law was "warranted by existing law."  Fed. R. Civ. P. Rule 11(b)(1),(2).

### E. The AG's Participation Provides Sufficient Adversity

Inexplicably, the AG asserts that, notwithstanding its participation, this case lacks adversity.[2] This assertion is without merit. In its Order adding the AG as amicus, the Court explained that it did so precisely to remedy the "non-adversarial stance" of Plaintiff Purdom and Defendant Morgan and "to sharpen the presentation of the merits." Order and Op 1-2, ECF No. 45; *see also United States v. Windsor*, 133 S. Ct. 2675, 2680 (2013) (recommending use of *amici curiae* to ensure adversity) (citing *INS v. Chadha*, 462 U.S. 919, 940 (1983)). There is no reason, either advanced by the AG or otherwise, for the Court to alter its view that the AG's participation provides sufficient adversity.

### F. *Younger* Abstention Is Improper

The Supreme Court has admonished that ordinarily federal courts "should not refuse to decide a case in deference to the States," and that circumstances fitting within the *Younger* abstention doctrine are "exceptional." *Sprint Comms., Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013). The Court has narrowly constrained *Younger* abstention to situations where all three of the following conditions are met: (1) there is an ongoing state judicial proceeding; (2) the federal proceeding implicates important state interests; and (3) there is an adequate opportunity in the state proceeding to raise the constitutional challenges. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). Because Plaintiff Purdom successfully halted his threatened prosecution for failing to vacate before it was formally commenced by either the Mountain Home or Baxter County District Attorneys, abstention is inappropriate. *Baran v. Port of Beaumont Navigation Dist. of Jefferson Cty.*, 57 F.3d 436, 441 (5th Cir. 1995)

---

[2] The AG also cites the absence of any threat by Defendant Morgan to prosecute Plaintiff Purdom, and Plaintiff again invokes his prior arguments on this point.

("When no state proceedings are pending, a federal action does not interfere with state processes, and the policies on which the *Younger* abstention doctrine is premised are unavailing.").

The AG urges this Court to abstain despite its concession that that there are no proceedings in state court currently pending against Mr. Purdom. The AG does so by misrepresenting *Younger*. Contrary to the AG's discussion, *Younger* did not hold that federal courts should abstain even if the main plaintiff is not being prosecuted. *Younger* involved a federal challenge to a California state law by a state court criminal defendant who had already been charged under the law at the time he brought his suit. *Younger v. Harris*, 401 U.S. 37, 38-39 (1971). Thereafter, three individuals who had not been arrested or charged under the Act intervened to also challenge the state law. *Id.* at 39-40. The Supreme Court held that abstention was required as to Harris due to his pending prosecution. *Id.* at 49. But the Court did not rule on abstention with respect to the other three plaintiffs. It instead found that they were not proper parties to the action because none faced prosecution. *Id.* at 42.

*Munson v. Gilliam* also does not support abstention. 543 F.2d 48 (8th Cir. 1976). Though the opinion is unclear on whether the named plaintiff had been charged under the pre-2001 version of the statute when she filed the federal action, it is clear that the district court entered an injunction on behalf of four intervenors that had been arrested and charged under the statute. *Id.* at 51. By contrast, Mr. Purdom is the only plaintiff in this lawsuit, and there is no dispute that he is not currently charged under the statute. There is therefore no reason for the Court to abstain under *Younger*.

**II.     Plaintiff is Entitled to Summary Judgment on the Merits**

**A. Ark. Code Ann. § 18-16-101 authorizes a Debtors' Prison**

Failing to pay the registry is unquestionably an independent element of the 2001 statute because it enhances the law's maximum penalty to include incarceration. *Alleyne v. United States*, 133 S.Ct. 2151, 2155 (2013) ("Any fact that, by law, increases the penalty for a crime is an 'element' [of the crime]."). Because the statute contains no *mens rea* requirement for the enhancement, and imposes jail time solely because a tenant cannot afford the fee, the statute violates the state and federal prohibitions against debtors' prisons.

The AG argues that the 2001 statute does not constitute a debtors' prison under either federal law or Arkansas law. The AG notes that the statute ostensibly criminalizes a "willful refusal to vacate upon notice" and not a debt. State's Br. 7. However, regardless of the conduct prohibited by the Sections (a) and (b), Section (c) of the statute unequivocally conditions potential imprisonment on a tenant's ability to pay a pre-adjudication fee.

Compounding the AG's misrepresentation of what Section (c) penalizes, it attempts to analogize the statute's registry requirement with victim restitution. State's Br. 7. The State cites *United States v. Field*, 110 F.3d 592 (8th Cir. 1997) for the proposition that "voluntary payment of restitution prior to an adjudication of guilt is a legitimate consideration in determining whether a defendant is entitled to a reduction for acceptance of responsibility." State's Br. 20. This comparison is entirely unavailing. Failing to pay restitution prior to adjudication does not expose a defendant to a new, elevated offense. Failing to pay the pre-adjudication registry fee does. In this regard, the registry requirement in Ark. Code Ann. § 18-16-101 is not properly considered a voluntary payment, and it has nothing to do with whether a tenant accepts responsibility for the conduct. Instead, the registry requirement is a mandatory payment secured

by the coercive threat of jail time. Tenants who cannot make the registry payment face incarceration not for their underlying conduct, but simply as a result of being unable to make the registry payment.

The AG goes on to argue that the statute does not violate Article 2, section 16[3] of the Arkansas constitution because the statute only criminalizes a willful refusal to vacate. The AG insists that statute's requirement of a *willful* refusal to vacate satisfies the Arkansas constitutional requirement that "No person shall be imprisoned for debt in any civil action…unless in cases of fraud." Ark. Const. Art. 2 § 16. This argument is fatal for two reasons. As an initial matter, the State incorrectly implies that willful conduct and fraudulent conduct are equivalent. They are not. Black's Law Dictionary defines "willful" as "voluntary and intentional, but not necessarily malicious." *Black's Law Dictionary*, ((10th ed. 2014). Fraud, on the other hand, requires dishonesty or intent to deceive. *Born v. Hosto & Buchan, PLLC*, 2010 Ark. 292 (Ark. 2010). For these reasons, the Arkansas Supreme Court has expressly rejected the notion that willfulness may substitute for fraud under Article 2, Section 16. *State v. Riggs*, 305 Ark. 217 (1991) (striking down statute criminalizing contractor's failure to pay for materials where statute only required knowing or willful failure to pay). Because the statute does not require fraud, it violates the Arkansas constitution.

More fundamentally, the State conflates the statute's requirement for a willful refusal to vacate with the statute's enhanced penalties for failing to pay the registry fee. The Arkansas constitution's requirement that a debtor engage in fraud in order to be imprisoned for owing a debt applies only to the penalty for failure to pay. Yet the statute contains no scienter

---

[3] The State incorrectly cites this provision as Article 2, Section 6 of the Arkansas constitution.

requirement for the separate offense of failure to make a registry payment. This omission creates a debtors' prison under the Arkansas constitution.

Finally, the AG argues that because the Baxter County District Court has no registry, Mr. Purdom would not have been expected to comply with the statute. State's Br. 21. This argument is purely speculative since no party has offered any evidence supporting this conclusion. The text of the statute is therefore the only proper basis for the analysis, and strict compliance with the statute requires a registry payment. [4]

## B. The 2001 Statute Impermissibly Chills the Right to Trial

The 2001 statute unnecessarily chills a defendant's exercise of the right to a fair trial by conditioning the possibility of jail time on whether the accused pays to the court an amount of money solely determined by the complainant landlord. An accused who can afford to pay this ransom and remain in the residence while contesting the charges will of course feel less pressure; if acquitted, he gets his money back. The story is quite different for those who cannot afford to pay. They can vacate the residence while contesting the charges, in which case they will not have to pay the registry. But, even if they are acquitted, the statute does not allow him to return to the residence. Thus, a landlord who wrongly accuses a tenant of failing to vacate still gets precisely what they sought in the first place: the tenant's eviction. Or, these tenants can remain in the residence and face an enhanced conviction and potential jail sentence, solely because they could not pay the registry fee. This is a stark and unacceptable choice in a system that is required to presume the innocence of the accused. For the many who simply plead guilty to avoid these consequences, it is no choice at all.

---

[4] Even with no formal registry, a the Baxter County district judge could order Mr. Purdom to provide payment to the Baxter County District Clerk to hold until the outcome of the lawsuit.

The AG first argues that the statute does not chill the right to trial because it does not affect a tenant's decision to go to trial; it only affects a tenant's decision to remain in the residence and pay the fee. State's Br. 24. This position states the problem exactly backwards. The fact that tenants must decide whether to remain in the residence and pay the fee is precisely the coercion that impermissibly chills their right to trial. Similarly, the AG posits that the registry actually lowers pressure on innocent tenants "by creating a mechanism by which he can demonstrate a good faith effort not to deprive the landlord of his rights under the contract." State's Br. 24-25. Overlooked in this assertion is the fact that an innocent tenant may be unable to make this "good faith" demonstration entirely because *they have already paid the rent due under the contract*. And, as explained above, a tenant who vacates because they cannot afford "good faith" can consider themselves evicted no matter the outcome of the criminal case, since the statute does not require any good faith efforts by the landlord to reserve the residence for acquitted tenants.

### C. The 2001 Statute Violates Mr. Purdom's Right to Due Process

At the outset of its due process analysis, the AG relies on Mr. Purdom's claim of innocence in the Amended Complaint to argue that Mr. Purdom cannot challenge the constitutionality of the 2001 statute because the facts in this case "do not present any legitimate application of the statute." The AG elaborates that because Mr. Purdom claims he was current on his rent, "the statute never came into operation, and Purdom did not forfeit his right to occupy the residence." State's Br. 25. As discussed above in Section 1 B, the Lewises alleged nonpayment and served Mr. Purdom with a ten-day notice to vacate. Had Mr. Purdom not filed this lawsuit and averted his prosecution, his contention that he paid the rent simply would have been a defense to those charges. Just as Mr. Purdom's assertion of a defense does not defeat

ripeness, it is irrelevant to whether Mr. Purdom is entitled to enjoin a prosecution that would violate his right to due process.

In asserting that Mr. Purdom did not forfeit his right to occupy his residence because he does not concede his guilt, the State implies two fundamental due process safeguards into the statute: (1) the presumption of innocence, and (2) an opportunity to be heard prior to being deprived of property. However, the 2001 statute lacks these two procedural safeguards. To plead not guilty under the 2001 statute, a defendant must either move out immediately or "deposit into the registry of the court a sum equal to the amount of rent due on the premises." Ark. Code Ann. § 18-16-101 (2001). An accused tenant must decide whether to move or pay without the option to request a hearing to determine the amount owed or whether the statute has, in fact, properly come into operation. Consequently, the landlord's accusation of unpaid rent, rather than whether a tenant actually failed to pay rent, extinguishes the tenant's the right to occupy. The absence of these safeguards is the crux of Purdom's due process argument.

The AG next contends that Mr. Purdom's due process rights have not been violated because Defendant Morgan never took any action against him, and therefore there was no state action. State's Br. 26. This again recycles many of the AG's arguments against justiciability. As Mr. Purdom has previously noted, he would have been prosecuted under the authority of either the City of Mountain Home or Baxter County if he had not filed this lawsuit. The fact that Mr. Purdom prospectively halted his prosecution to avoid imminent constitutional harms does not support the conclusion that Mr. Purdom cannot permanently protect his due process rights.

The AG then attempts to establish that the 2001 statute provides due process by applying the three-factor analysis outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976). The *Mathews* factors, when correctly applied, necessarily demonstrate that the 2001 statute fails to protect the

due process rights of accused tenants. While the 2001 statute implicates significant property interests for a defendant, his home and money, the statute contains no procedural safeguards to prevent erroneous deprivation of property. Arkansas civil law already provides a viable alternate procedure to protect landlord interests with much lower fiscal and administrative burdens for the State.

The private interest implicated by the 2001 statute are the defendant's interest in the rental property he is required to permanently abandon and/or the amount of money he is required to pay into the court registry. The amount includes regular rent payments as they become due and "a sum equal to the amount of rent due on the premises." Ark. Code Ann. § 18-16-101 (2001). The "amount of rent due" is not determined after judicial review, but rather is based on the amount the landlord alleges is owed by the defendant. In the Pulaski County case of *State v. Smith*, the landlord alleged that defendant Smith owed $22,353, which meant that Smith was required to pay that amount into the court registry if she wished to plead not guilty and avoid immediately vacating her home. Landlord's Aff., *State v. Smith*, 60CR-14-2707 (Pulaski Co., Nov. 11, 2014). Even if the alleged amount of rent due is only one month's rent, a monthly rental payment may be a significant portion of a defendant's monthly income, particularly if an innocent defendant has already paid rent for the month.

The AG's assertion that the registry payment is voluntary, because a defendant can vacate the property at any time, ignores Arkansas tenants' well-established right to due process prior to being deprived of their rental property. In Arkansas, a tenant is not considered an invitee on the landlord's premises but "has a right equal to that of the landlord to exclusive possession of the property." *Glasgow v. Century Prop. Fund XIX*, 299 Ark. 221, 222 (1989). Both Arkansas and federal law recognize a tenant's right to judicial process prior to being dispossessed of their

property. *See Greene v. Lindsey*, 456 U.S. 444, 449–50 (1982); *Gorman v. Ratliff*, 289 Ark. 332, 337 (1986).

The AG argues that this Court should consider the landlord's "interest in not being wrongfully deprived of contractually due rental payments" as a competing interest under this prong. State's Br. 26-27. However, a landlord's right to collect rent payments is not impacted by the existence or lack of a statutory registry. As the payment obligation comes from a civil contract between the tenant and landlord, the landlord has a civil remedy available. Through the failure to vacate statute, Arkansas has elevated the financial interests of landlords above all other contracting parties. Arkansas does not use the criminal justice system to enforce or collect on any other civil contract: mortgage companies, credit card companies, and auto lenders cannot request criminal prosecution when their debtors fall behind on payments, but must seek redress through the civil court.

The risk of erroneous deprivation under the 2001 statute is great. Criminal charges are filed based solely on a landlord's affidavit, with no independent investigation or judicial determination of the amount alleged owed. The landlord could be mistaken, or even dishonest, in reporting the amount of rent due. Although the money is held in a court registry until a final hearing, the tenant is still deprived of the property during this time. It does not matter that the court may subsequently identify the error and return the money: even a temporary or partial impairment to property rights is sufficient to merit due process protections. *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991). For tenants who are unable to make the registry payment and decide to abandon their homes rather than face potential jail time, the statute offers no mechanism to return the home to the tenant if the failure-to-vacate process was initiated erroneously.

The AG incorrectly asserts that *Fuentes v. Shevin*, 407 U.S. 67 (1972) is no longer good law. Despite the AG's carefully selected citations from the *Mitchell v. W.T. Grant Co* (416 U.S. 600) concurrence and dissent, the *Mitchell* decision merely limited the applicability of *Fuentes*. In *Connecticut v. Doehr*, the Supreme Court reaffirmed that the *Mitchell* decision was decided on a different legal and factual basis than that in *Fuentes* and treated both decisions as good law. 501 U.S. 1, 9–10, (1991).

While both *Fuentes* and *Mitchell* involved statutes authorizing pre-adjudication seizure of personal property, the specific factual differences that led to the differences in the Court's holdings are instructive. Unlike the procedures examined in *Fuentes*, the seizure procedure in *Mitchell* contained the following due process protections: "Louisiana's provision of an immediate post deprivation hearing along with the option of damages; the requirement that a judge rather than a clerk determine that there is a clear showing of entitlement to the writ; the necessity for a detailed affidavit; and an emphasis on the lienholder's interest in preventing waste or alienation of the encumbered property." *Connecticut v. Doehr*, 501 U.S. at 9–10 (citing *Mitchell v. W.T. Grant Co.*, 416 U.S. at 615–618.

The 2001 failure-to-vacate statute has none of the due process safeguards provided in the Louisiana sequestration statute examined in *Mitchell*. Unlike in the Louisiana statute, an Arkansas landlord is not required to post a bond prior to the tenant being required to move out or make a registry payment. The tenant has no option to request an immediate pre-deprivation hearing. Citations for arrest can be issued by a law enforcement officer with no oversight by the prosecutor or judicial review. The statute does not require the landlord's affidavit be detailed or contain any specific information. While it is arguable that the State has an interest in protecting

a landlord's rental property, both Purdom and the AG agree that the 2001 statute does not allow for a rental property to be returned to a landlord.

The *Mathews* test has the court balance the first two factors with the third: the public interest, including the administrative burden and other societal costs that would be associated with requiring a hearing prior to the deprivation. 424 U.S. at 347. While the administrative burden on a criminal court would increase if a pre-deprivation hearing was required, Arkansas already has an alternate civil process that provides landlords with more relief without additional administrative costs or due process violations: the unlawful detainer (Ark. Code Ann. § 18-60-304, *et seq.*). It is important to note again that while the AG claims that the purpose of the statute is not to evict tenants, the practical relief sought by landlords is that the tenant charged under the statute will vacate the premises under the threat of criminal charges. After a civil hearing in an unlawful detainer case, a judge can order a tenant to pay past due rent amounts and can order the Sheriff to remove the defendant from the property. This alternate civil process is less administratively burdensome on the State, as the civil process does not require the State to bear the burden of serving and prosecuting the holdover tenant.

Given the fundamental property interests implicated by the failure to vacate statute, the absence of procedural safeguards to avoid erroneous and permanent deprivation, and existence of alternate procedures with lower administrative burdens, it is clear that the 2001 statute violates Mr. Purdom's right to due process.

### D. The 2017 Statute Violates Mr. Purdom's Right to Due Process (Counts III and IV)

The 2017 criminal eviction statute violates the key due process requirement of notice and chills a tenant's constitutional right to be heard at trial by authorizing unlimited convictions and limitless fines based on arbitrary factors beyond the tenant's control, such as how long it takes a

landlord to file a charge. Criminal liability mounts even after a tenant pleads guilty and for as long as the criminal lasts. Particularly for the overwhelming number of tenants who must face these charges without legal representation, the unavoidable consequence of this scheme is to pressure tenants into leaving their residence and pleading guilty.

The AG overstates precedent when it asserts that the 2017 statute has already withstood constitutional challenges on these grounds. State's Br. 32. No court has conclusively examined whether the 2017 statute chills a defendant's right to trial, and no court has examined at all whether the threat of compounding convictions and fines violates a tenant's due process right to notice. The AG relies primarily on the Eighth Circuit decision in *Munson v. Gilliam*, 543 F.2d 48 (8th Cir.1976), which stated, without analysis, that the pre-2001 version of the statute to which Act 159 returns did not chill the right to trial. But the Arkansas Supreme Court recognized in *Duhon v. State*, 299 Ark. 503, 509–10 (1989), that *Munson* did not deal directly with the act's constitutionality but rather conducted a review limited to an order of injunction entered by the District Court. There is also no evidence that either the plaintiff in *Munson* raised, or that the Eighth Circuit considered, the specific claim Mr. Purdom urges: that the statute's failure to cap the maximum number of convictions or potential fines is unconstitutional. *Munson*'s precedential and persuasive value can therefore be safely disregarded.

The AG relies on the case of *Yaodi Hu v. Vill. of Midlothian*, 631 F. Supp. 2d 990 (N.D. Ill. 2009), to support its assertion that daily fines are constitutional. But the facts in *Yaodi Hu* are easily distinguished from those faced by defendants being prosecuted under the 2017 statute. In *Yaodi Hu*, a property owner faced a series of fines for uncut grass, with the beginning and end date of the alleged violation clearly laid out in a citation that provided a notice of the amount of fines and hearing rights. An individual accused under the 2017 statute, however, receives an

initial notice that provides the tenant with ten days to vacate the premises. After that notice, the number of days until a citation is issued, or a trial, depends on factors which are completely outside the defendant's control. But the most critical point is one the AG never acknowledges: a tenant continues to accumulate potentially unlimited charges *after they have plead not guilty*. By design, a tenant can have no advance knowledge of how many charges he will ultimately face by the end of the proceedings.

The AG's discussion of this lack of notice underscores the statute's constitutional infirmity. In effect, the AG asserts that tenants should simply move out, since "a defendant who vacates the residence can 'insist on a trial' as much as he would like without facing mounting charges." State's Br. 33. But an innocent tenant who vacates can literally never go home again. This blatant disregard for the presumption of innocence, both by the 2017 statute and the State of Arkansas, is alarming. The effect is to privilege the interests of landlords to evict tenants over the interests of presumptively innocent tenants to contest the charges without fear of wrongful eviction.

The AG's failure to recognize this inherent imbalance is further revealed by its denial that the statute can be abused by landlords, whose sole interest, according to the AG, "is in regaining possession of his residence—not simply sticking it to the resident." State's Br. 33. That the statute has been repeatedly abused by landlords around the state has been well-documented and cannot be seriously contested. *See* Human Rights Watch, *Pay the Rent or Face Arrest: Abusive Impacts of Arkansas's Draconian Evictions Law* 1 (Feb. 2013). Additionally, it is inaccurate to say that a landlord's interest is strictly regaining possession of her property. The landlord also wants to accomplish this objective as efficiently and inexpensively as possible. Such landlords have no better ally than the criminal eviction statute, which applies the power of the State to

coerce tenants out of their residences without requiring landlords to suffer the inconvenience, delay, and costs of filing for a civil eviction, where the landlord and tenant would be on more equal footing. *See C*arol R. Goforth, *Arkansas Code § 18-16-101: A Challenge to the Constitutionality and Desirability of Arkansas' Criminal Eviction Statute*, 2003 Ark. L. Notes 21 (2003).

Ultimately, while Act 159 changes the criminal penalties a defendant faces, the mechanism by which the statute coerces tenants to abandon their property without due process remains the same. Under both versions of the statute, a tenant who refuses or fails to pay rent when it is due "shall at once forfeit all right to longer occupy the dwelling house or other building or land." Ark. Code Ann. § 18-16-101(a). Under the 2001 and 2017 versions, a tenant who wishes to remain in the residence and be heard regarding his right to possession is threatened with greater criminal penalties. By the time a defendant is afforded a hearing under either version, he will already be subject to heightened criminal penalties if he has chosen to retain possession. Both statutes effectively circumvent a tenant's right to be heard prior to losing his or her home. The Court should therefore find the failure to vacate statute unconstitutional in its entirety under the Fourteenth Amendment.

### E. Both Versions of the Statute Authorize Cruel and Unusual Punishment

It bears repeating for the Eighth Amendment analysis that Arkansas is the only state in the country that criminalizes a tenant's failure to vacate a residence. Neither the 2001 nor the 2017 statutes serve a valid penological goal. Rather, in the words of the bipartisan, non-legislative commission that recommended fully repealing the law, the statutes "criminalize[] breach of a contract, using the criminal law to enforce a civil matter." Non-Legislative Commission for the Study of Landlord-Tenant Laws, Report, 35 U. ARK. LITTLE ROCK L. REV.

17 (2013).  The 2001 statute achieves this windfall for landlords by requiring non-vacating tenants to pay a registry fee, and authorizing jail for those who do not pay.  The 2017 effectively evicts tenants on behalf of landlords by authorizing unlimited fines—and fines that mount even after a tenant has plead not guilty—for those who remain in the residence.  Both statutes therefore authorize cruel and unusual punishment.

The AG's brief makes no effort to defend—or even mention—the 2001 statute's authorization of jail time for those who do not pay registry fee under the Eighth Amendment.  It advances instead three basic arguments in support of criminalizing evictions generally: 1) that the statute is within the state's police power; 2) that Arkansas' lone standing on criminal evictions does not necessarily violate the Eighth Amendment; and 3) that the fines authorized under the statutes are proportionate to those available for other nonviolent offenses in Arkansas.  The Court should reject each of these contentions.

Citing the Supreme Court's decision in *Rummel v. Estelle*, 445 U.S. 263 (1980), the AG asserts that Plaintiff's evolving standards analysis is incomplete because some state will always have the most severe penalty for a given offense.  While correct in isolation, this assertion confuses differences in degree for differences in kind.  The point is not that Arkansas punishes non-vacating tenants more harshly than other states; it is that Arkansas is the only state that criminally punishes non-vacating tenants *at all*.

*Rummel* therefore offers little guidance.  That case dealt with a recidivist statute that authorized a life sentence for those who commit three felonies.  Contrary to the defendant's assertions, the Court observed that it was inaccurate to say that Texas had the nation's harshest, or even a particularly unique, recidivist statute.  Two other states—Washington and West

Virginia—punished repeat felons just as harshly, and most other states prescribed some degree of elevated punishments for recidivist. *Id.* at 279.

Such comparisons are not possible with Arkansas' criminal eviction statute. In fact, with the exception of Florida, there is no evidence that any other state has *ever* criminalized non-vacating tenants. Lynn Foster, *The Hands of the State: The Failure to Vacate Statute and Residential Tenants' Rights in Arkansas*, 36 U. ARK. LITTLE ROCK L. REV. 1, 8–10 (2013).

In this respect, the criminal eviction statute does not really violate an evolving standard of decency. It is more accurate to say that, in passing these statutes, Arkansas law devolved from the established standard. See *Duhon v. State*, 299 Ark. 503, 512 (1989) (Purtle, dissenting) ("Arkansas has won another distinction: it is the only state in the nation which imposes criminal sanctions on a person who does not pay his rent on time. . . The majority has, with all the speed of a crawfish, backed into the 19th century.").

This conclusion applies with equal force to the AG's contention that the statutes are a valid exercise of police power because a state may punish wrongful trespassers. State's Br. 35. The AG's position wholly ignores the fact that Arkansas is the only state that treats non-vacating tenants as trespassers. In fact, as explained above, the criminal eviction statute is the only remaining place in Arkansas law that still maintains this outdated legal fiction. *Infra*, p. 15.

So too falls the AG's argument that penalties under the criminal eviction statutes are proportional, for which the AG cites the classifications and penalties for various theft offenses. State Br. 36. It is safe to say that every other state criminalizes such offenses as theft of a public benefit. It is equally safe to say that no other state classifies failure to vacate a residence as theft. Further, because there is no upper limit to the maximum fine under the 2017 statute—a point the

AG does not contest—there is no reliable way to gauge its penalties relative to other criminal offenses.

In focusing on the statutes' standing relative to the rest of the country, the AG fails to address another glaring indicator that the laws are cruel and unusual: the failure to vacate law—at least the 2001 version—was largely unenforced *within the state of Arkansas*. As Plaintiff noted in his opening brief, state prosecutors and judges refuse to enforce the statute, and an emerging chorus of courts struck down the 2001 statute in its entirety. Pl's Br. 21. As a result, Baxter County is one of a few outlier jurisdictions where these prosecutions still occur. That the legislature has now abandoned the 2001 law supports the contention that the registry is uniquely problematic under the Eighth Amendment.

## CONCLUSION

Because this lawsuit alone halted Mr. Purdom's prosecution under the 2001 criminal eviction statute and the Attorney General has now provided sufficient adversity to sharpen the critical issues presented, this case is justiciable. On the merits, both the 2001 and 2017 statutes unconstitutionally criminalize a civil dispute and should be struck down in their entirety. But the statutes are also uniquely objectionable under state and federal law: the 2001 statute coerces tenants into pleading guilty and abandoning their residence by ransoming a tenant's right to trial and freedom from incarceration on the payment of a registry fee dictated solely by the accusing landlord, while the 2017 statute accomplishes the same ends by authorizing unlimited convictions and fines even after a tenant pleads not guilty. Mr. Purdom again respectfully requests that the Court permanently enjoin any prosecution against him under either statute.

Respectfully submitted this 4th day of August, 2017,

Mitchell Purdom

By:

/s/ Jason Auer (Ark. Bar No. 2011304)
LEGAL AID OF ARKANSAS
1200 Henryetta Street
Springdale, AR 72762
Telephone: (800) 967-9224 ext. 6318
jauer@arlegalaid.org

/s/ Amy Pritchard (Ark. Bar No. 2010058)
UALR Bowen Legal Clinic
1201 McMath Avenue
Little Rock, AR 72202
Telephone: (501) 324-9966
apritchard@ualr.edu

/s/ Brandon Buskey* (AL ASB2753-A50B)
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th FL
New York, NY 10004
(212) 549-2654
bbuskey@aclu.org

*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of August, 2017, this notice was filed using the

CM/ECF system which sends notice to all counsel of record.

/s/ Amy Pritchard